**In re Yuval RAN, Debtor in a Foreign Proceeding.**

**No. 06–37067–H5–15.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

June 12, 2008.

**260**

H. Miles Cohn, Sheiness Scott, et. al., Houston, TX, for Foreign Representative.

Hector Duran, Office of US Trustee, Houston, TX, for U.S. Trustee.

Wayne Kitchens, Heather Heath McIntyre, Steven Douglas Shurn, Hughes Watters and Askanase, Houston, TX, for Debtors.

### ORDER AFTER REMAND

KAREN K. BROWN, Bankruptcy Judge.

### I. Order Denying Recognition Under Chapter 15

After a full evidentiary trial on the merits, consideration of all of the evidence presented at trial, and evaluation of the credibility of the witnesses, on May 22, 2007, the Court issued its order denying recognition of a foreign proceeding under 11 U.S.C. § 1515, which states the Court's findings, in pertinent part:

> ... the Court finds that Houston, Harris County, Texas is the center of Yuval Ran's main interests and has been since 1997.

Order Denying Recognition of Foreign Proceeding Under 11 U.S.C. § 1515 at p. 4.[1] Zuriel Lavie appealed that order to the district court.

---

1. In addition, the Court found the following in its order of May 22, 2007:

 1. Prior to 1997, Yuval Ran was a notable Israeli businessman associated with nearly one-hundred Israeli companies including a public Israeli company known as Israel Credit Lines Supplementary Financial Services, Ltd.
 2. Between 1992 and 1995, Credit Lines greatly expanded its activity through monies it raised and borrowed.
 3. In 1994, these companies began sustaining large losses and in 1995, Credit Lines began liquidating its various interests.
 4. In April 1997, Ran left Israel and has never returned.
 5. Subsequent to his departure, in July of 1997, a bank instituted receivership proceedings against him in Israel.
 6. Zuriel Lavie was appointed temporary receiver, and eventually, trustee, over Ran's property.
 7. After leaving Israel, Ran moved to Houston, Harris County, Texas in May or June of 1997.
 8. Ran's wife and children joined him in Houston shortly after he arrived, and the family has resided here without interruption since.
 9. Ran maintains no bank accounts outside of Harris County, Texas.
 10. Ran and his wife are salaried employees of a furniture company in Houston and own a home in the Houston area.
 11. Ran's wife and five children are United States Citizens.
 12. Ran has a green card and is a legal permanent resident of the United States.
 13. Ran testified that he intends to remain in the United States for the remainder of his life.
 14. After leaving Israel, Ran temporarily assisted in collecting debts owed to the company, but ceased doing so when receivership and liquidation proceedings for Credit Lines began in 1998.
 15. Ran testified that he carries out no business activity in Israel, and has not done so since 1998.

## II. Remand and Instructions of the District Court

On February 6, 2008, the district court issued its order of remand which instructs the Court to: (1) determine what factors are appropriate when considering the center of main interests of an individual debtor; (2) make findings of fact in accord with those factors; and (3) determine if the presumption that an individual debtor's habitual residence is his center of main interests has been rebutted. The district court further instructs:

Therefore, a review of proffered proof is required to determine whether contrary evidence justifies a finding that an individual debtor's COMI is somewhere other than the place of his habitual residence. See, e.g., *In re Loy,* 380 B.R. 154; *In re SPhinX,* 371 B.R. 10 (contrary evidence reviewed in determining COMI of corporate debtor).

*Lavie v. Ran,* 384 B.R. 469, 471 (S.D.Tex. 2008).

In *In re Loy,* 380 B.R. 154, 163 (Bankr. E.D.Va.2007), the court ruled that the single factor of debtors' ownership of real property located outside the country of debtors' habitual residence, was insufficient to rebut the § 1516(c) presumption that debtors' habitual residence was the location of debtors' center of main interests. *In re Loy,* 380 B.R. 154, 163 (Bankr. E.D.Va.2007). The bankruptcy court in *In re SPhinX, Ltd.,* 351 B.R. 103, 121 (Bankr. S.D.N.Y.2006), aff'd, 371 B.R. 10 (S.D.N.Y. 2007), held that the foreign representative's improper motive in seeking recognition of the debtors' insolvency proceeding as a foreign main proceeding under Chapter 15 was the decisive factor in the court's denial of recognition of the foreign proceeding as a main proceeding. The court stated:

But for one additional consideration, ... in balancing all of the foregoing factors the Court might be inclined to find the

16. Ran testified that he left Israel after his car and his brother's office were firebombed; his brother's car was destroyed in an acid attack; his parents were harassed; and he and his wife received death threats, as well as threats to kidnap their children.

17. Ran's two youngest children were born in the United States.

18. Ran has applied to become a United States citizen, and his application is pending.

19. By order dated October 28, 1999, Zuriel Lavie was appointed by the District Court of Tel–Aviv–Jaffa as trustee of the property of Yuval Ran.

20. The order declares that Yuval Ran "went bankrupt," and, among other things, orders the debtor to "deposit his passport in the Official Receiver's hands" to prohibit the debtor's exit from Israel.

21. The evidence shows that since 1997, Yuval Ran has lived with his family and worked in Houston, Harris County, Texas, which the Court finds is Yuval Ran's habitual residence.

22. Consequently, the Court finds that Houston, Harris County, Texas is the center of Yuval Ran's main interests and has been since 1997.

23. As the center of Ran's main interests are not in Israel, the proceeding pending in Israel for which Lavie has been appointed trustee does not constitute a "foreign main proceeding" under 11 U.S.C. § 1502(4).

24. The evidence shows that since 1997, the only economic activity carried out by Yuval Ran and his only place of operations has been in Houston, Harris County, Texas.

25. The Court finds that Yuval Ran's "establishment" for purposes of § 1502(2) is Houston, Harris County, Texas.

26. Consequently, the Israeli proceeding does not constitute a foreign nonmain proceeding under § 1502(5).

27. As the Israeli proceeding does not constitute either a foreign main or a foreign nonmain proceeding, the Israeli proceeding is not entitled to recognition under 11 U.S.C. § 1517.

Debtors' COMI in the Cayman Islands and recognize the proceedings as foreign main proceedings ... normally the Court would recognize the Cayman Islands proceedings as main proceedings. However, a primary basis for the Petition, and the investors' tacit consent to the Cayman Islands proceedings as foreign main proceedings, is improper: that is, it has the purpose of frustrating the RCM Settlement by obtaining a stay of the appeals upon the invocation of Bankruptcy Code section 362(a) that would go into effect under section 1520(a)(1) upon such recognition. See Tr. at 87, at which counsel for the JOLs reluctantly admitted this strategy, after considerable efforts by Mr. Stride and counsel to obfuscate it. Id. at 41–4, 47, 84. As noted above, staying the appeal would have the same effect as overturning the RCM settlement without addressing or prevailing on the merits. (It is this sidestepping of consideration of the merits, or, at a minimum, obtaining strategic leverage without addressing the merits, rather than the JOLs' taking a position contrary to the settlement, that is the problem.) Indeed, given that the JOLs did not articulate a proper basis, or even actively pursue a request, for any other relief under chapter 15–for example, an injunction or turnover of property-with the exception of a request for further discovery primarily relating to the appeals, Tr. at 88–89, this litigation strategy appears to be the only reason for their request for recognition of the Cayman Islands proceedings as foreign main proceedings.

In any event, the strategy taints the JOLs' request and the investors' consent to it, giving the clear appearance of improper forum shopping.

*In re SPhinX, Ltd.*, 351 B.R. 103, 121 (Bankr.S.D.N.Y.2006), aff'd, 371 B.R. 10 (S.D.N.Y.2007). The district court affirmed, holding "Such circumstances as this support denial of recognition as a foreign main proceedings on the ground that the recognition is being sought for an improper purpose." *In re SPhinX, Ltd.*, 371 B.R. 10, 18 (S.D.N.Y.2007).

By leaving undisturbed this Court's finding that Lavie failed to prove the alternative statutory basis for recognition, the district court recognized that Lavie failed to prove that Ran has an establishment in Israel. Under Chapter 15, "establishment" means any place of operations where the debtor carries out a nontransitory economic activity. 11 U.S.C. § 1502(2). The Court's findings concerning Ran's establishment are set forth at note 1, findings 24–26.

### III. Factors Used to Identify Center of Main Interests

### A. Comparison of Chapter 15 with International Law on Cross–Border Insolvency

■ An order shall be entered recognizing a foreign proceeding as a foreign main proceeding only if the debtor's center of main interests is located in the country where the foreign proceeding is pending. 11 U.S.C. §§ 1502(4); 1517(a)(1). If the foreign proceeding is not pending in a country where the debtor has its center of main interests or where it has an establishment, then the foreign proceeding is simply not eligible for recognition under Chapter 15. *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122 (Bankr.S.D.N.Y. 2007) (citing Daniel M. Glosband, SPhinX Chapter 15 Opinion Misses the Mark, 25 Am. Bankr.Inst. J. 44, 45 (Dec./Jan.2007) at 85), aff'd, Slip Copy, 2008 WL 2198272 (S.D.N.Y.2008).

Chapter 15 is based on the UNCITRAL Model Law on Cross–Border Insolvency.

The House Report issued in connection with enactment of Chapter 15 as part of P.L. 109–8, Bankruptcy Abuse Prevention and Consumer Protection Act, states that the Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) ("the Guide") is to be consulted for guidance as to the meaning and purpose of its provisions. H.R. REP. 109–31(I), 2005 U.S.C.C.A.N. 88.

 The use of a single criterion, center of main interests, for qualifying a foreign proceeding as a main proceeding, is intended to avoid the risk of various foreign proceedings competing for recognition as the main proceeding. The Guide at section 127.[2] Thus, a debtor has only one center of main interests.

2. The Report of the Working Group on Insolvency Law on the Work of its Nineteenth Session, United Nations General Assembly A/CN. 9/422 (25 April 1996), illustrates the process of development of the provisions regarding recognition of foreign insolvency proceedings:

Article 6. Recognition of foreign insolvency proceedings

76. The text of the draft article as considered by the Working Group read as follows:

"(1) For the purposes of this Law, a foreign judgement opening insolvency proceedings shall be recognized [from the time that it becomes effective in the State of the opening of proceedings],

*VARIANT A*

unless it is shown that there was no substantial connection between the foreign jurisdiction and the debtor.

*VARIANT B*

if the judgement emanates from a competent court or authority. A court or authority shall be deemed competent if that court or authority has jurisdiction based on any of the following criteria:

(a) *domicile or habitual residence of the debtor;*

(b) seat or place of registered office;

(c) [principal place of business] [centre of debtor's main interests];

(d) location of assets.

*VARIANT C*

if the foreign proceeding originates from a court or competent authority in a State [appearing on the following list: ... ] [certified for purposes of recognition of insolvency by [name of appropriate entity or officer in enacting State].]

. . . .

*Paragraph (1)*

79. The Working Group noted that paragraph (1) presented several options as to a rule to be followed by the courts of the enacting State in determining whether to accord recognition to a foreign proceeding. The Working Group paused to consider the necessity of including such a provision, in view of the fact that the model provisions were meant to open as wide a door to cooperation as would be appropriate, while at the same time not prejudicing the rights of local creditors under the insolvency laws of the enacting State. The Working group affirmed the utility of article 6, which could play an important part in the provisions designed to secure an opportunity for foreign representatives to seek cooperation and assistance in the enacting State.

80. While some support was expressed for variant A, the predominant inclination in the Working Group was to follow an approach based on variant B. At the same time, it was acknowledged that selecting variant B would not preclude the possibility of offering, as an additional option for States, variant C. Inclusion of a variant C ...

81. As to the content of a provision based on variant B, a number of suggestions were made so as to enable the courts of the enacting State to have a better and more predictable idea of how they should react to an application for recognition.

82. In the first place, and in view of the decision to distinguish in article 7 (relief available upon recognition) between foreign main and foreign nonmain proceedings, the Working Group agreed that such a distinction would have to be reflected also in article 6. It was suggested to the Working Group that, aside from linking the rule on recognition to whether the foreign proceeding was a main or non-main

■ In interpreting Chapter 15, the Court is to consider its international origin and the need to promote an application of Chapter 15 that is consistent with the application of similar statutes adopted by foreign jurisdictions. 11 U.S.C. § 1508. European Council Regulation No. 1346/2000 of 29 May 2000 is the regulation applicable to the member states of the European Union governing initiation and

proceeding, it might be useful to predicate the rule on recognition in some way on the range of effects that would flow from recognition. Another suggestion was that possible additional factors might be added to the list set forth in variant B of paragraph (1).

83. It was also noted that consideration might be given to limiting paragraph (1), for the purposes of recognition of a foreign proceeding as a main proceeding, to one or the other of the factors listed. It was said that such a limitation would be necessary to avoid placing the courts in the enacting State in the position of dealing with multiple claims for recognition as a foreign main proceeding.

*Paragraph (2)*

. . . .

86. Upon completion of the first round of consideration of article 6, the Working Group referred it to the drafting group with a view to taking into account the above deliberations. The drafting group subsequently submitted the following revised version of article 6 to the Working group:

"(1) For the purposes of this Law, a foreign proceeding shall be recognized:

(A) as a foreign main proceeding if the court of the foreign proceeding has jurisdiction based on the:

(i) domicile or habitual residence of the debtor;

(ii) seat or place of registered office of the debtor; or

(iii) [principal place of business of the debtor] [centre of the debtor's main interests];

or

(B) as a [non-main] foreign proceeding if the debtor had an establishment [within the meaning of article ___] in the foreign jurisdiction.

[(C) If recognition is sought in respect of more than one foreign proceeding, the court [shall] [may] designate one such proceeding as the foreign main proceeding.]

"(2) The court shall grant or refuse an application for recognition of a foreign main proceeding within ___ days after the application has been filed with the court."

. . . .

88. A concern that was emphasized was that the revised version of paragraph (1) raised the spectre of recognition of more than one foreign main proceeding. It was suggested that such a possibility would place courts in an untenable position and would detract from the acceptability of the model provisions. The attempt to equip the court to deal with such a case, by including in subparagraph (c) the authorization top select one of several competing foreign proceedings as the main proceeding, was not regarded as an adequate solution.

89. The Working Group acknowledged the concern about possibly giving rise to recognition of more than one foreign proceeding as "main", and, upon further consideration, agreed that paragraph (1)(a) should be modified to refer to one factor as a competency test for recognition of a foreign main proceeding. It was agreed that that factor should be the "centre of the debtor's main interests".

90. Advantages cited in favour of the selection of that particular factor included that it would encompass as debtors both legal and natural persons, and that it would be in harmony with the approach and terminology utilized in the European Union (EU) Convention. The latter aspect would enable to draft model provisions to contribute to the development of a standardized and widely understood terminology, rather than inadvertently contributing to an undesirable diversification of terminology.

91. It was suggested, in order to add further specificity to the rule, to establish a rebuttable presumption that the registered seat of the debtor was the centre of its main interests.

recognition of insolvency proceedings opened in an EU member state.[3] The EU

3. The opinion of Mr. Advocate General Ruiz–Jarabo Colomer in *Proceedings brought by Staubitz–Schreiber* (Case C–1/04), [2006] E.C.R. I–701 [2006] I.L.Pr. 30 (ECJ Grand Chamber 2006) (Reference for a preliminary ruling: Bundesgerichtshof—Germany (Federal Supreme Court)), summarizes the history of the EU Regulation as follows:

AG7 The idea of regulating insolvency proceedings within the Community has its origins in Art.220 of the EC Treaty (now Art. 293 EC), which calls upon the Member States, so far as is necessary, to enter into negotiations with each other with a view to securing for the benefit of their nationals, inter alia, the simplification of formalities governing the reciprocal recognition and enforcement of judgments of courts or tribunals and of arbitration awards. AG8 That provision gave rise, first of all, to the well-known 1968 Brussels Convention on jurisdiction and the enforcement of judgments in civil and commercial matters [FN6] ("the Brussels Convention").

FN6 [1978] O.J. L304/36. Amended successively by the Convention of Accession of October 9, 1978 on the accession of the Denmark, Ireland and the United Kingdom [1978] O.J. L304/1 and amended version p.77, by the Convention of October 25, 1982 on the accession of the Greece [1982] O.J. L388/1 by the Convention of May 26, 1989 on the accession of Spain and the Portugal [1989] O.J.L285/1, and by the Convention of November 29, 1996 on the accession of Austria, Finland and Sweden [1997] O.J. CI5/1. That legislation is currently contained in Regulation 44/2001 of December 22, 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters [2001] O.J. L12/1.

AG9 However, Art.1 of the Brussels Convention excludes from the scope of the convention "bankruptcy, proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings", and therefore those areas remained to be dealt with in a future agreement between the Member States. Nevertheless, a committee of experts drafted two proposals between 1963 and 1980. In the case of the second proposal, which was based on the principles of unity and universality,[FN7] a group from the Council of the Community was asked to prepare a report but work was suspended in 1985 owing to lack of agreement.[FN8]

FN7 By "principle of unity" is meant the existence of a single set of proceedings for the whole of the territory of the Community, while "principle of universality" refers to the fact that the proceedings extend to all the debtor's assets wherever they may be situated.

FN8 Virgos/Schmit Report on the Convention on Insolvency Proceedings (Virgos–Schmit Report) in Virgos and Garcimart n, Comentario al Reglamento Europeo de Insolvencia, (Civitas, Madrid, 2003), point 3.

AG10 It is important to point out that, even before the decision was taken to adopt the Community legislation, the Member States had fostered the process of mutual recognition and enforcement of judgments in bankruptcy proceedings by means of bilateral treaties, a list of which is set out in Art.44(1) of Regulation 1346/2000. That article provides that the Regulation is to replace the conventions concerned. *646

AG11 In addition, other initiatives arose outside the Community sphere, particularly within the Council of Europe, which culminated in the European Convention on certain international aspects of bankruptcy opened for signature in Istanbul in 1990 ("the Istanbul Convention"). However, the entry into force of Regulation 1346/2000 leaves the ratification of that convention in doubt. The main contribution of the Istanbul Convention is the introduction of greater flexibility in the use of the abovementioned principles.[FN9]

FN9 Virgos/Schmit Report, point 4.

AG12 The Istanbul Convention left its mark on the subsequent process of drafting the Regulation, because, with a view to avoiding the complexities of the 1985 draft convention, an ad hoc group of national experts finalised the text of the Convention on Insolvency Proceedings, done at Brussels on November 23, 1995, which has a less rigid approach and simpler solutions.[FN10]

FN10 Virgos/Schmit Report, point 5.

AG13 Unlike its immediate predecessor at Community level, the scheme of the latter convention was based around the principle of universality limited by the possibility of opening one or more secondary proceedings in other States, whose scope was limited to the respective territories of those countries.[FN11] FN11 ibid.

Regulation provides, "The 'centre of main interests' should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." *Id.* at recital 13.

The EU Regulation was preceded by the European Union Convention on Insolvency Proceedings. The text of the Regulation and of the Convention are "identical in all material respects." *Eurofood IFSC Ltd.* (C–341/04), [2006] ECR 3813, (ECJ 2006) (Opinion of Advocate–General Jacobs, 2005)(Reference for a preliminary ruling: Supreme Court–Ireland) at ¶2. The Report on the Convention on Insolvency Proceedings by Miguel Virgos and Etienne Schmit provides "useful guidance when interpreting the Regulation." *Eurofood* at ¶2. The Report explains that as used in the phrase "centre of main interests," the term "interests" includes not only commercial, industrial and professional activities, but also the general economic activities of private individuals (eg. consumers). Furthermore, the term "main" serves as a criterion for the cases where these interests include activities of different types which are run from different centres. The Report at ¶75. The Report states, "In principle, the centre of main interests will in the case of professionals be the place of their professional domicile and for natural persons in general, the place of their habitual residence." *Id.* A debtor's centre of main interests "must be identified by reference to criteria that are both objective and ascertainable by third parties." *Id.*

The EU Regulation provides, "The courts of the Member State within the territory of which the centre of a debtor's main interests is situated shall have jurisdiction to open insolvency proceedings." *Id.* at Article 3.1. Under the EU Regulation, the petitioner, either the debtor or a creditor, seeking to initiate a main insolvency proceeding, represents that the country in which the petition is filed is the

AG14 Since not all 15 Member States acceded to it, the 1995 convention collapsed irrevocably. However, as a result, the convention underwent a transformation, rather like a chrysalis: its content was unaltered but its legal status changed so that it ceased to be an international treaty and became a regulation pursuant to the second paragraph of Art.249 EC.

AG15 Nurtured by Finland and Germany, the impulse for that transformation flourished in the fertile ground of Arts 61(c) EC (formerly Art.73i of the EC Treaty) and 67(1) EC, (formerly Art.730 of the EC Treaty), which were "communitarised" under the Treaty of Amsterdam, thereby constituting one of that Treaty's main achievements.[FN12] FN12 (T. Wiedemann, Visa, Asyl, Einwanderung, in Schwarze, J. (Coord.), EU–Kommentar, BadenBaden, 2000), p.842.

AG16 The convention was finally free from the creeping fate to which it was destined by its former status as a treaty and its new nature endowed it with the gracefulness resulting from the direct applicability inherent in regulations.

AG17 It is clear from the preamble to Regulation 1346/2000 that the proper functioning of the internal market requires three main elements in the sphere of insolvency: first, a Community act requiring co-ordination of the measures to be taken regarding an insolvent debtor's assets [FN13]; secondly, the effectiveness of cross-border insolvency proceedings [FN14]; and, lastly, the avoidance of so-called forum shopping, that is where parties have incentives to transfer assets or judicial proceedings from one Member State to another, seeking to obtain a more favourable legal position.[FN15]

FN13 Recital 3 in the preamble to Regulation 1346/2000.

FN14 Recital 2 in the preamble to Regulation 1346/2000.

FN15 Recital 4 in the preamble to Regulation 1346/2000.

AG18 The Regulation does not seek to govern insolvency proceedings in an all embracing consolidated manner but rather the applicable law, international jurisdiction to open such proceedings, and the recognition of those proceedings in other Member States.

centre of main interests of the debtor. The petitioned court opens main insolvency proceedings if it determines it has jurisdiction under the EU Regulation as the location of the debtor's centre of main interests. *Id.* at Article 3.1 While under the EU Regulation, the determination of the location of the debtor's centre of main interests is made at the time the petition is presented initiating the insolvency proceeding, under Chapter 15, the determination is made at the time the petition for recognition is presented to the U.S. court.

If the court of an EU member state determines that it has jurisdiction under the EU Regulation to open main insolvency proceedings as the location of the debtor's centre of main interests, that decision is not subject to reconsideration by the courts of any other EU member state and must be accepted as final on the issue. *Id.* at recital 22 and Article 17.2. In contrast, Chapter 15 does not provide for recognition of an insolvency proceeding based on a foreign court's determination that it has jurisdiction as the location of the debtor's center of main interests. *In re SPhinX, Ltd.*, 351 B.R. 103, 120 n. 22(Bankr.S.D.N.Y.2006) ("... [E]ven if the Cayman Court had made such a determination [that the insolvency proceeding was a main proceeding] it would not be binding on this Court"), aff'd, 371 B.R. 10. Instead, Chapter 15 requires the U.S. court to make an independent evaluation of the location of the debtor's center of main interests at the time a petition for recognition is presented.

The EU Regulation is not the international equivalent of Chapter 15 or the Model Law as it does not provide any procedure for recognition by the courts of an EU member state of insolvency proceedings initiated in a non-EU member state. *See* European Council Regulation No. 1346/2000 of 29 May 2000, Article 3.1.

Similarly, the EU Regulation does not provide any procedure for recognition of an insolvency proceeding when the debtor's centre of main interests is located outside of the EU member states. *Id.* at Article 3.2.

## B. Objective Factors Considered by European Courts

Although, as stated in *Proceedings brought by Staubitz–Schreiber* (Case C–1/04), [2006] E.C.R. I–701 [2006] I.L.Pr. 30 (ECJ Grand Chamber 2006), the term "centre of main interests" "has the status of an independent concept of Community law, which confers on it a uniform meaning that is independent of the national legal systems ... [and][i]t must therefore be given a single Community definition," the concept of identifying the location of an individual's "centre of interests" is well recognized in the EU. The right of freedom of movement within the European Community allows individual citizens to travel freely between European countries to live and work. Various EU regulations and the national laws of EU member states governing, among other things, taxation, unemployment compensation, and old age compensation, base jurisdiction on the location of the individual's centre of interests. European courts and administrative authorities are routinely presented with complex fact scenarios requiring an evaluation of objective factors to determine the location of an individual's permanent centre of interests for purposes of application of these laws and regulations.

As used in Community law, "permanent residence," "habitual residence," and "normal residence" mean the location of the individual's permanent centre of interests. *See Anciens Etablissements d'Angenieux Fils Aine v. Hakenberg* (Case 13/73), [1973] ECR 935 (ECJ 1973) (Reference for a preliminary ruling: Cour de cassation-

France) (holding that under Community law, the phrase, "permanent residence," meaning habitual residence, for purposes of determining which social security system applied to a French citizen who represented various French businesses, who had a permanent residence in France where he worked three months of the year, but spent nine months of the year in Germany on continuous business-canvassing tours on behalf of his French clients, and who had no fixed place of abode in Germany, must be understood as the place in which the worker "has established the permanent centre of his interests and to which he returns in the intervals between his tours").

A temporary move to another member state does not mean that an individual has moved the permanent centre of his interests and cannot, therefore, be regarded as terminating his habitual residence. *Pedro Magdalena Fernandez v. Commission of the European Communities* (C–452/93) [1994] ECR 4295 (ECJ 3rd Chamber 1994). When an individual relocates, for purposes of determining his centre of interests, account must be taken of the length and continuity of the person's residence before he moved, the length and purpose of his absence, the nature of his occupation in the other Member State, the family situation, and the intentions of the person. *Di Paolo v. Office National del'Emploi,* (Case 76/76), [1977] ECR315(ECJ 1977) (Reference for a preliminary ruling: Cour de cassation—Belgium). The concept of residence signifies a person's "habitual or permanent centre of interests"; a person resides in a particular place if he has occupational or family ties there, and the length of his stay there is relevant only in so far as it throws light on those ties. *Pinna v. Caisse d'Allocations Familiales de la Savoie,* (Case 41/84) [1986] E.C.R. 1(ECJ 1986) (Reference for

a preliminary ruling: Cour de cassation—France).

In other words, 'residence' is not based simply on a physical fact, such as that of determining a person's address; what is more important is the intention that the stay should be of a permanent character. As a result, a person may be resident in a place even if he spends only a few months there and, conversely, a long stay may not constitute residence—for instance where the person concerned extends his stay for the purposes of study, work, treatment or recreation but does not intend it to be permanent. *Pinna v. Caisse d'Allocations Familiales de la Savoie,* (Case 41/84) [1986] E.C.R. 1(ECJ 1986).

Formal and quantitative factors such as the number of days a person remains in a location per year or the fact that an individual possesses an official residence permit may evidence actual residence, but these factors are not decisive where other evidence exists which suggests that the centre of an individual's interests is, in fact, located elsewhere. *Schaflein v. Commission of the European Communities,* (Case284/87) [1988] ECR 4475, (ECJ 2nd Chamber 1988). "Residence is not based simply on the actual fact of living in a given place. It also involves the intention of thereby achieving the continuity which stems from a stable way of life and from the course of normal social relations." *Id.* (Opinion of Advocate–General Mancini).

In *Gouvras–Laycock v. Commission of the European Communities* (T44/89)(CFI 3rd Chamber 1990) [1990] 3 C.M.L.R. 174, the court was required to determine the location of Gouvras–Laycock's centre of interests. Gouvras–Laycock was a British national and official of the Commission of the European Communities, whose father lived in Dublin, and whose mother, a Greek national, lived in London as a mem-

ber of the staff of the Greek Embassy in Great Britain. Gouvras–Laycock's husband was a Greek national who worked in Luxembourg. Gouvras–Laycock had lived in London and been employed by British Airways from July 1974 to September 1982, except for a leave period from June 1980 through May 1981 when she lived with her husband in Athens. From May 1981 to October 1982 she lived in London then moved to Luxembourg where she began working on September 1, 1986 in the Official Publications Office of the European Communities in Luxembourg. Gouvras–Laycock contended that she took up permanent residence in Athens, that she and her husband own a house there, that she was married in Athens and lived there prior to entering the service of the Commission, that she retains family ties there, and that the centre of her interests is there. The court agreed that there were more relevant ties establishing Athens over any other place as the centre of the applicant's interests.

In *Rigsadvokaten v. Ryborg*, (Case C–297/89) [1993] 1 C.M.L.R. 218 (ECJ 6th Chamber 1991) (Reference from Denmark by the Hojesteret (Supreme Court)) the court rejected the contention of Danish authorities that Ryborg, a Danish national, was a resident of Denmark. Ryborg had emigrated to Germany where he had obtained work and an apartment. However, he traveled frequently to Denmark in a German-registered motor car to visit a woman friend resident in Denmark with whom he regularly stayed for the night. On the premise that Ryborg was normally resident in Denmark, Danish authorities confiscated his car which was not registered in Denmark and charged Ryborg with the offence of intentionally smuggling his car into Denmark without declaring it to the customs authority for the purpose of payment of customs duties and of tax, and with the offence of using the car in Den-

mark without having paid tax. Since the impoundment of his car, Ryborg was only able to visit on weekends. Thereafter, on 13 March 1989 Ryborg obtained German nationality. Ryborg admitted that from July or August 1982 onwards, he spent nearly every night and most weekends at his friend's house, but denied that he had transferred his residence to Denmark.

In *Ryborg*, the court held that the consistent case law of the court provides that "residence" is the place in which the individual has established the permanent centre of his interests. *Id.* Once residence has been defined as "a person's habitual or permanent centre of interests," it is clear that occupational links and personal links—in particular the number of days (or nights) spent in a particular place in the course of a year—are all to be regarded as relevant factors, individually and collectively, in determining a person's normal residence. *Id.* Quantitative criterion, for example, the number of nights spent in a particular place, cannot be regarded as decisive if other factors point to a situation different from that which derives from the quantitative criterion alone. *Id.* Thus, despite the fact that Ryborg had spent every night and/or weekend in Denmark, the court found that he had never manifested any intention to move permanently into his friend's house; he had never moved furniture or other personal effects to Denmark and never contributed in any way to the household expenses. *Id.* Therefore, the court held that in the context of determining "normal residence," "the mere fact that a national of member-State B who has moved to member-State A, where he has found employment and accommodation, has after a certain date and for over a year spent almost every night and weekend with a woman friend in member-State B whilst retaining his employment and his accommodation in member-State A is not

sufficient to justify the conclusion that he has moved his normal residence to member-State B." *Id.*

In *Swaddling v. Adjudication Officer* (C90/97), [1999] ECR 1075, [1999] Fam. Law 382, (ECJ 5th Chamber 1999) (Reference for a preliminary ruling: Social Security Commissioner—United Kingdom), a British national, who had worked mainly in France for 15 years, then lost his job, and was unable to find other work in France, returned to the UK and claimed income support. He declared that he no longer wished to take up employment which involved spending long periods working abroad. The ECJ ruled that the term "residence" has a Community-wide meaning. It means a person's habitual residence and refers to the State where the habitual centre of that person's interests is to be found. *Id.* Relevant considerations in determining that location are the person's family circumstances, his reasons for moving, the length and continuity of his residence, the security of his employment, and his apparent intentions as they appear from all the circumstances. *Id.* The court found that the short length of the applicant's residence since his return to his State of origin, where his close relatives live and in which he intends to remain, could not preclude his entitlement to income support from that State. *Id.*

In *Louloudakis v. Greece* (C262/99) [2001] ECR 5547 (ECJ 6th Chamber, 2001) (Reference for a preliminary ruling: Trimeles Dioikitiko Protodikeio Irakleiou–Greece) the Greek court sought clarification of the criteria relevant to a determination of "normal residence" under Article 7(1) of Council Directive 83/182/EEC of 28 March 1983 for tax exemptions within the Community for vehicles temporarily imported into one Member State from another where a person has both personal and occupational ties in two Member States.

The facts of the case showed that Mr. Louloudakis: (1) was born in Greece in 1956 and moved to Italy in 1974; (2) held Greek and Italian nationality; (3) held a Greek passport and driver's license and an Italian identity card and driver's license; (4) owned a house in Florence, Italy; (5) rented a house in Greece; (6) with his wife, started a business in Florence, Italy, Studio Fiorentino SA, and another business in Greece, Kritiki Viomikhania Elaioladou AE (Krivel); (7) filed income tax returns in Greece; (8) was an architect insured professionally by a Greek insurance association, but had never pursued his profession in Greece; and (9) was registered on the electoral roll of the town of San Severo, Italy, where he voted in the elections of 21 April 1996, subsequent to the facts material to the main proceedings. In addition, his children attended both a private school in Greece and a school in Florence. One of the children had received inoculations in San Severo, Italy, on 18 August 1994, 24 September 1994, and 25 February 1995. In March 1995, Greek authorities impounded three vehicles owned by Studio Fiorentino, which were registered in Italy, and fined Mr. Louloudakis for customs charges and penalties on the basis that he was normally resident in Greece and had wilfully failed to pay duties due.

The European Court of Justice held that the phrase "normal residence," contained in the Directive, means the location of the individual's permanent centre of interests. *Id.* The location of an individual's permanent centre of interests must be determined in the context of an overall assessment by reference to all the relevant facts including the actual presence of the person concerned and of the members of his family, availability of accommodation, the place where the children actually attend school, the place where business is conducted, the place where property interests are situat-

ed, and the place of administrative links to public authorities and social services, inasmuch as those factors express the intention of that person to confer a certain stability on the place of connection, by reason of the continuity arising from a way of life and the development of normal social and occupational relationships. *Id.* In the event that such an overall assessment does not result in its determination, primacy must be given to personal ties. *Id.*

Personal ties are an individual's links with natural persons, that is, with specific individuals. *Alevizos v. Ikonomikon,* (Case C–392/05), [2007] 2 C.M.L.R. 51 (ECJ 4th Chamber, 2007) (Reference from Greece—Simvoulio tis Epikratias (Council of State)). If an individual has changed his residence from one Member State to another Member State and lives in the new state together with his wife and his underage children, that is a strong indication that his personal ties have moved there despite the fact that he may also have personal ties in his home state with other family members. *Id.* An individual's personal ties are, as a rule, with the persons with whom he lives permanently in a common household. *Id.* Administrative links to public authorities and social services are possible criteria for determining a person's centre of interests, but only in so far as those factors express the intention of that person to confer a certain stability on such ties by reason of continuity and a way of life. *Id.* Normally, it would not be appropriate, in determining the focal point of the personal ties of the person concerned, to give primacy to such factors over his ties with specific individuals with whom he lives in a common household. *Id.* Residence means the centre of interests of the individual concerned, and refers to the place where the person has established and intends to maintain the permanent or habitual centre of his interests and it implies, irrespective of the purely quantitative element of the time spent by the person concerned in a particular country, not only the actual fact of living in a given place, but also the intention of thereby achieving the continuity which stems from a stable way of life and from the course of normal social relations. *Borbely v. Commission of the European Communities,* (Case F–126/05) 2007 WL 98303, (CFI 2007). A temporary posting to a country does not preclude a person from making a specific place the centre of his interests. *Id.* It is for the authorities to examine on a case-by-case basis whether individuals whom it appoints have indeed moved the centre of their interests to the place of their Community posting. Such an assessment includes elements of subjectivity with actual residence constituting one factor which, among others, determines the centre of the official's interests. *Id.*

In *Skjevesland v. Geveran Trading Co Ltd (No.4),* [2003] B.C.C. 391, [2002] EWHC 2898 (Ch. Div.2002), the U.K. court evaluated the impact of the EU Regulation on its jurisdiction to open insolvency proceedings brought by a creditor against Mr. Skjevesland, an international securities trader who regularly traveled on business between a number of cities in Europe, staying at his various residences, including a leased flat in London. The court determined that Mr. Skjevesland did not have his centre of main interests in the UK; therefore the UK court did not have jurisdiction under the EU Regulation to open insolvency proceedings. *Id.* Nonetheless, insolvency proceedings could be opened against Mr. Skjevesland if his centre of main interests was not otherwise located in an EU member state. The evidence showed that Mr. Skjevesland during the prior three years spent 30 per cent of his time in Spain; 22.5 per cent of his time in Switzerland; 15 per cent of his time in France; 7.5 per cent of his time in Nor-

way/Sweden; and 25 per cent of his time in England. Mr. Skjevesland owned properties in Marbella, Spain; Oslo, Norway; Divonne, France; and Villars, Switzerland. Most of Mr. Skjevesland's business was done either over the telephone or the internet from France or Spain. While he spent the majority of his time in Spain, he regarded Switzerland as the place where he had emotional ties and as his home. The court found that Switzerland was the location of his family, his wife's family, his emotional ties, his pension, and his bank accounts, and that all Mr. Skjevesland had always wanted to be and had been was a Swiss banker. Based on these factors, Switzerland was the location of Mr. Skjevesland's center of main interests. Therefore, as Switzerland is not an EU Member State, jurisdiction for an insolvency proceeding in the UK was proper under UK national law.

In *X v. Fortis Bank (Nederland) NV*, [2004] I.L.Pr. 37, (HogeRaadDen Nederlanden (Dutch Supreme Court) 2004), the court rejected X's argument that the location of his habitual residence was the location of his centre of his main interests. The court states:

> Paragraph 13 of the Preamble to the Regulation states that the "centre of main interests" should be the place where the debtor habitually conducts the management of his interests, and where he is recognised as so doing by third parties. Neither the text of the Regulation nor its Preamble specify that for natural persons the centre of main interests within the meaning of Art.3(1) of the EU Insolvency Regulation must be the place of their habitual residence, as was argued in para.2.4.1. Nor can sufficient support for this argument be found in the passage to which the paragraph refers, from Virgos and Schmit's explicatory report on the unimplemented Convention on Insolvency Proceedings

of 1995, which formed the model for the EU Insolvency Regulation. Paragraph 13 of the Advocate General's opinion does not imply that, for natural persons, the place of their habitual residence "must be considered to be" the centre of their main interests, nor that this should be inferred where no evidence to the contrary is adduced. This legal objection is therefore founded upon an incorrect interpretation of the law, and accordingly fails.

*Id.* at 18. In dismissing his appeal, the court found unavailing X's arguments that he had moved from the Netherlands to the Virgin Islands, and from there to Belgium, where he had resided until shortly before the court's decision; that he had carried out no commercial activities in the Netherlands since 1994; that Fortis had sent bank statements to his Belgian address; and that he did not in fact have substantial interests in a large number of companies registered in the Netherlands. The court held that the evidence supported the lower court's judgment and showed that X had a large number of companies registered in the Netherlands, had continued to administer his commercial interests from within the Netherlands, and that Fortis had sent business correspondence to X's address in the Netherlands to which X had, without fail, responded. *Id.* at 19.

In *Shierson v. Vlieland–Boddy*, [2006] I.L.Pr. 12, [2005] EWCA Civ 974, (CA (Civ Div) 2005), Mr. Malcolm Shierson, the trustee in bankruptcy of Mr. Martin Vlieland–Boddy, initiated insolvency proceedings against his twin brother, Mr Clive Vlieland–Boddy to recover costs awarded in favor of Shierson and against Mr Clive Vlieland–Boddy in an earlier voluntary insolvency proceeding initiated by Mr Clive Vlieland–Boddy in which he had claimed the UK as his centre of main interests. In response to the involuntary petition, Mr.

Clive Vlieland–Boddy contended that subsequent to the initiation of his voluntary proceeding, he had moved his centre of main interests to Spain and was no longer subject to the jurisdiction of the UK courts. The opinion of Lord Chadwick states:

> 38 It is convenient to consider the first two of those grounds together. The issue on which each may be said to turn is, I think, the same: what weight should be given to the perception of creditors as to the debtor's centre of main interest at the time that credit is extended. In particular, how ready should the court be to accept that the debtor is free to change his centre of main interest between the time at which credit is extended and the opening of insolvency proceedings. It is a striking feature of the present case that the petition debt, itself, arises from costs orders made in proceedings in which the debtor was invoking the insolvency jurisdiction of the High Court on the basis that his centre of main interests was in the United Kingdom.
>
> Centre of main interest
>
> ... [B]efore it could assume jurisdiction to open main insolvency proceedings, the court of a Member State must be satisfied that, at the time that it did so, the debtor's centre of main interests was situated within the territory of that state.

Addressing the argument that recital (4) to the Regulation reflects the intent that the Regulation should be interpreted to discourage forum shopping by the debtor, the court stated at 276–277:

> ... [S]een in context, recital (4) of the Regulation provides little, if any, assistance to the appellant. The need "to avoid incentives for the parties to transfer assets ... from one Member State to another" is met by the Community

regime (introduced by the Regulation) which gives to the main proceedings "universal scope" and the aim of "encompassing all the debtor's assets". So no advantage is obtained by moving assets from one territory to another. The need "to avoid incentives to the parties to ... transfer judicial proceedings from one Member State to another"— by which, I think, is meant (at least, primarily) the need to avoid forum shopping by the creditor—is met by restricting the courts in which insolvency proceedings may be opened. For my part, I do not think that recital (4) is directed to the question in the present case: whether and in what circumstances there could be a change in the debtor's centre of main interests. Recital (4) cannot be read as imposing some restriction on the ability of the debtor to choose where he carries on the activities which fall within the concept "administration of his interests"; nor to require the court to give some special meaning to the phrase "where the debtor conducts the administration of his interests on a regular basis". The most that can be said, as it seems to me, is that the court should look critically at the facts which are said to give rise to a change in the centre of a debtor's main interests in circumstances where there are grounds for suspicion that the debtor has sought, deliberately, to change his centre of main interests at a time when he is insolvent in order to alter the insolvency rules which will apply to him in respect of existing debts.

As to the argument that jurisdiction to open main insolvency proceedings is conferred on the courts of the Member State in which the centre of the debtor's main interests is situated so that a creditor will be able to assess what will be the centre of

the debtor's main interests at the time when he extends credit, the court stated:

> [I]t is reading too much into the commentary to conclude that the centre of main interests will not change—if the underlying facts change—between the time that the creditor extends credit and the time when a court is asked to open insolvency proceedings. That could not have been in the minds of the commentators.
>
> 49 The point may be illustrated by an example. Suppose a case in which the debtor incurs debts in the territory of State A and then (while those debts remain unpaid) relocates his home and business to the territory of State B. He then incurs further debts in the territory of State B and becomes insolvent. It is of as much importance to the creditors in State B to know—or to be able to assess—where the debtor's centre of main interests is situated as it is to the creditors in State A. Seen through the eyes of the creditors in State B the debtor is conducting the administration of his interests on a regular basis in State B. Seen through the eyes of the creditors in State A, at the time when the debts to them were incurred, the debtor was conducting the administration of his interests on a regular basis in State A. But it is a necessary feature of the Community regime established by the Regulation that, at the time when a court is asked to open insolvency proceedings, the debtor can have only one centre of main interests within the Community. There is nothing in the Virgos–Schmit commentary which suggests that that should situated in State A, rather than in State B. In particular, there is nothing in that commentary to suggest that the centre of main interests, once established in State A, remains in State A—notwithstanding the debtor's reloca-

tion to State B—until, say, all his debts in State A have been paid.

> 50 In my view, the commentary does not support any principle of immutability. It does no more than point out the obvious advantages of a scheme under which, so far as possible, a creditor will be able to identify the legal system which will govern his debtor's insolvency at the time he advances credit. But unless the debtor is to be prevented from relocating his home and business—which he may wish to do for perfectly proper reasons unconnected with any threat of insolvency—there is a limit to the extent to which those advantages can be guaranteed.

Lord Chadwick summarized his conclusions as follows:

> (1) A debtor's centre of main interests is to be determined at the time that the court is required to decide whether to open insolvency proceedings. In a case where those proceedings are commenced by the presentation of a bankruptcy petition, that time will normally be the hearing of the petition. But, in a case such as the present, where the issue arises in the context of an application for permission to serve the petition out of the jurisdiction, the time at which the centre of the debtor's main interests falls to be determined will be at the hearing of that application. Similar considerations would apply if the court were faced with an application for interim relief in advance of the hearing of the petition.
>
> (2) The centre of main interests is to be determined in the light of the facts as they are at the relevant time for determination. But those facts include historical facts which have led to the position as it is at the time for determination.

(3) In making its determination, the court must have regard to the need for the centre of main interests to be ascertainable by third parties; in particular, creditors and potential creditors. It is important, therefore, to have regard not only to what the debtor is doing but also to what he would be perceived to be doing by an objective observer. And it is important, also, to have regard to the need, if the centre of main interests is to be ascertainable by third parties, for an element of permanence. The court should be slow to accept that an established centre of main interests has been changed by activities which may turn out to be temporary or transitory.

(4) There is no principle of immutability. A debtor must be free to choose where he carries on those activities which fall within the concept of "administration of his interests". He must be free to relocate his home and his business. And, if he has altered the place at which he conducts the administration of his interests on a regular basis—by choosing to carry on the relevant activities (in a way which is ascertainable by third parties) at another place—the court must recognise and give effect to that.

(5) It is a necessary incident of the debtor's freedom to choose where he carries on those activities which fall within the concept of "administration of his interests", that he may choose to do so for a self-serving purpose. In particular, he may choose to do so at time when insolvency threatens. In circumstances where there are grounds for suspicion that a debtor has sought, deliberately, to change his centre of main interests at a time when he is insolvent, or threatened with insolvency, in order to alter the insolvency rules which will apply to him in respect of existing debts, the court will need to scrutinise the facts which are said to give rise to a change in the centre of main interests with that in mind. The court will need to be satisfied that the change in the place where the activities which fall within the concept of "administration of his interests" are carried on which is said to have occurred is a change based on substance and not an illusion; and that that change has the necessary element of permanence.

56 Applying those principles to the facts in the present case, I find it impossible to say that the judge was not entitled to reach the conclusion that he did—that the debtor's centre of main interests had moved to Spain. The judge was clearly aware that there were grounds for suspicion that the move was self-serving and might not be genuine. But, unless he were prepared to disbelieve the debtor's evidence as to what he was doing in Spain and why he was living there, the judge was bound to take that evidence into account.

*Shierson v. Vlieland–Boddy,* [2006] I.L.Pr. 12 (CA (Civ Div) 2005).

In *Proceedings brought by Staubitz–Schreiber* (Case C–1/04), [2006] E.C.R. I–701 [2006] I.L.Pr. 30 (ECJ Grand Chamber 2006) (Reference for a preliminary ruling: Bundesgerichtshof—Germany (Federal Supreme Court)), the court held that where the debtor had initiated a voluntary insolvency proceeding in Germany, but before the German court had entered an order of bankruptcy, had moved her domicile to Spain with the intention of living and working there, thereby transferring her center of main interests, the German court retained jurisdiction to enter an order of bankruptcy. Addressing concerns about forum shopping, the Opinion of Mr. Advocate General Ruiz–Jarabo Colomer states:

71. If forum shopping is defined as the search by a plaintiff for the international jurisdiction most favourable to his claims, (34) there is no doubt that, in the absence of legal uniformity in the different private international law systems, that phenomenon must be accepted as a natural consequence which is not open to criticism. (35)

72. Thus the dispute is dealt with at the place which is most suitable for reasons of substance and procedure. Forum shopping is merely the optimisation of procedural possibilities and it results from the existence of more than one available forum, which is in no way unlawful. (36)

73. However, where forum shopping leads to unjustified inequality between the parties to a dispute with regard to the defence of their respective interests, the practice must be considered and its eradication is a legitimate legislative objective.

74. The Community legislature took that approach in relation to insolvency and analogous proceedings, because, in the 4 th recital in the preamble to the Regulation the legislature states its intention to avoid incentives for parties to transfer assets or judicial proceedings from one Member State to another, seeking to obtain a more favourable legal position, and includes the term forum shopping in brackets.

75. That fundamental principle of Regulation No 1346/2000 would be rendered worthless if a debtor were entitled to transfer the centre of his main interests to another Member State between the filing of the request and the judgment opening insolvency proceedings. Such an interpretation is incompatible with the efficient operation of cross border insolvency proceedings which, pursuant to the 2nd recital in the preamble thereto, the Regulation seeks to achieve, because it would oblige creditors to pursue debtors wherever the latter chose to establish themselves with any degree of permanence, thereby depriving the former of the necessary legal certainty.

76. Moreover, as the Commission states in its written observations, such conduct would mean that the courts in every place where a debtor established himself would be required to determine, of their own motion, whether or not they had jurisdiction, (37) which would be incompatible with the principle of the sound administration of justice.

77. In any event, on the facts of the main proceedings this is not a case of forum shopping, since Ms Staubitz–Schreiber herself argues for the jurisdiction of the court with which she filed the request for the opening of insolvency proceedings. The reason for her position is a special feature of German insolvency law known as Restschuldbefreiung, pursuant to which a debtor receives a general discharge from any remaining debts which have not been paid with the return from the realisation of assets, (38) a rule which is unknown in the legal systems of the other Member States. (39)

[2006] ECR I–701. The ruling of the ECJ states:

Article 3(1) of EC Regulation 1346/2000 on insolvency proceedings must be interpreted as meaning that the court of the Member State within the territory of which the centre of the debtor's main interests is situated at the time when the debtor lodges the request to open insolvency proceedings retains jurisdiction to open those proceedings if the debtor moves the centre of his main interests to the territory of another Member State after lodging the request but before the proceedings are opened.

*Staubitz–Schreiber* (C1/04), [2006] E.C.R. I–701, [2006] I.L.Pr. 30 (ECJ (Grand Chamber) 2006).

In *Cross Construction Sussex Ltd v. Tseliki,* [2006] EWHC 1056 (High Court of Justice Chancery Division 2006), the court dismissed for lack of jurisdiction, a creditor's bankruptcy petition brought under EU Regulation 1346/2000 against Tseliki. The opinion of Mr. Justice Lewison states:

1 This is an appeal from a decision of District Judge Gamber of 23 December 2005. The district judge dismissed a petition for the bankruptcy of James Tseliki on the grounds that it had not been established to his satisfaction that the court had jurisdiction to entertain the petition. The question arises under Regulation (EC) 1346/2000 which deals with jurisdiction relating to the opening of insolvency proceedings.

. . . .

5 Although it may seem obvious it is perhaps worth saying that the concept of a centre of main interests means that there can only be one such centre. There may be many centres of interests but only one of them can be the main centre. The petition arose out of a debt for which judgment was given in the Technology and Construction Court in this country. The underlying debt, in fact, arose out of an arbitration award which, as I understand it, was consequent upon work which had been carried out by the petitioning creditor. That work was carried out on a property in England.

6 The debtor's evidence about his own position was given in his first witness statement. He said that he was a Greek citizen and exhibited a copy of his passport. He said in paragraph 3 of his witness statement:

"I am not a resident in this country and have not been for at least 15 years. I consider that my domicile of choice, in so far as I have changed my domicile of origin from Greece, is France as I am habitually resident at Chateau de Saint Germain Beaupre 23160, France."

In paragraph 4 he said:

"I am an international businessman trading through the medium of limited companies in many jurisdictions around the world. However, this action is brought against me in my personal capacity. I have never traded in my personal capacity in any jurisdiction and particularly not in the United Kingdom."

In paragraph 6 he said:

"I am ordinarily resident at my address in France and spend approximately six months of the year there. I have lived there permanently for the last six years. As I am a Greek citizen I spend considerable periods of time visiting my 80 year old mother who is the matriarch and head of the family. She is resident in Greece. I visit my adult children who are resident in the United Kingdom and may visit them three or four times a year. However, I am not resident in the United Kingdom and have never been found to be resident by the tax authorities here. I spend, at the very most, 15 per cent to 20 per cent of the year in this country. When I am here I stay with friends, family or in hotels but usually with my children."

In paragraph 7 he said:

"As far as my economic interests are concerned, as I derive income from family discretionary trusts administered by my mother in Greece, this is my domicile for the purposes of payment tax. However, my emotional ties and principal residence is in France. Although I travel for work purposes all over the world, my wife resides and remains in France during my periods of absence."

7 Mr Tudway, who appears on behalf of the petitioning creditor, submits that the district judge was, in effect, wrong to accept that evidence and that the district judge should have paid far more attention to the objective facts. The objective facts are contained in a number of exhibits to which I have been taken. By way of preliminary Mr Tudway submits that the debtor's witness statement, not just the one from which I have quoted, but subsequent witness statements which he made, are evasive and cagey and notably short on documentary evidence to corroborate the debtor's assertions about his place of residence and business affairs. I think that there is force in Mr Tudway's criticism.

8 What then are the objective facts? The pointers in favour of a connection, to use a neutral word, between the debtor and the jurisdiction in England and Wales, are as follows:

(1) There is a personal telephone number which was revealed by a search of a British Telecom website. The personal telephone number is attributed to the debtor at an address in Ripe in Sussex;

(2) The passport, which the debtor exhibited to his witness statement, was in fact issued by the Greek Consulate in London;

(3) The debtor is registered as the owner of an aeroplane. The registration details with the Civil Aviation Authority reveal an address in Brighton as being his address;

(4) There is a website relating to a club of similar aircraft owners which lists him as living in Brighton;

(5) There is a letter written in 1996 by a company called Kittyhawk Farms Limited, to which I will return, which gives an address in Brighton as the address of that company.

9 Pointers to the lack of a connection between the debtor personally and the jurisdiction in England and Wales also appear from the objective facts: (1) The debtor is a Greek national; (2) It is accepted that he has a home in France; (3) The properties in and around Brighton which are relied upon as establishing the connection between the debtor and this jurisdiction are, or were at the material time, held, according to the Land Registry, not by the debtor personally but by a company called Kittyhawk Estates Limited of which Kittyhawk Farms Limited appears to have been a subsidiary. Kittyhawk Estates Limited is not a company registered within the jurisdiction but is a company registered in the Isle of Man.

10 In connection with the proceedings that led to the making of the order for summary judgment, thus creating the judgment debt, the debtor's solicitors came off the record and said, as they did so, that any further correspondence should be sent to the debtor at his address in France.

11 Mr Tudway points to the lack of documentary evidence to corroborate what the debtor has said. He says that it would have been easy for the debtor to have exhibited, and that he should have exhibited, documents relating to motor insurance, home insurance, utility bills, credit card statements, evidence of his directorships, business dealings and so on. I think there is force in that criticism and that the evidence which the debtor produced does have, what I might call, a defensive air to it.

12 The district judge went through the various exhibits though without analysing them in great detail. He said in his judgment that he did not find the debtor's evidence to be inherently incredible. Having gone through the exhibits he then concluded as follows:

"I cannot see, from what has been adduced by cross, that there is any evidence that Tseliki was acting personally. I am satisfied he was conducting the business of a limited company as a director and not in his own right and thus it cannot be said that he was conducting the administration of his interests. In my view it would not have been apparent to an objective observer that he was acting in anything other than on behalf of a corporate entity."

13 Mr Tudway criticises the district judge for having failed to distinguish between the carrying on of a business by a company and the discharge by a director of that company of his duties as director. The latter, he submits, can amount to the administration by the director personally of his own interests and as such can give rise to the location of a centre of main interests. In principle it seems to me that Mr Tudway is right in that submission but where, as here, the company is registered in the Isle of Man, one would expect that the discharge of the director's duties, in his capacity as director, would be in the Isle of Man or at least where the management of the company, as a corporate entity, took place. There was, in fact, no evidence about that and no exploration of where Mr Tseliki might have discharged his duties as director. I do not consider that the giving of instructions, on behalf of the company, to others to undertake, for example development projects, would be sufficient to establish that Mr Tseliki, in discharging his duties as director, was doing so in the place where the instructions were given. Moreover, it seems to me that it is not enough simply to establish a connection between the debtor and this jurisdiction. That, as Ms Higgins for the debtor submits, may establish a centre of interests but not necessarily a main one.

14 The task for the court is to balance the evidence on both sides giving appropriate weight to such evidence as may be adduced by the debtor himself. . . . It follows, in my judgment, that this appeal must be dismissed.

*Cross Construction Sussex Ltd v. Tseliki*, [2006] EWHC 1056 (High Court of Justice Chancery Division 2006).

Although an individual may be considered to have more than one habitual residence under national law, the ECJ has consistently interpreted EU law to provide that an individual cannot be habitually resident in more than one country at the same time. *Jane Elizabeth Marinos v. Nikolaos Lykourgos Marinos*, [2007] EWHC 2047 (High Court of Justice Family Division 2007). An individual may, however, be habitually resident in one country at the same time as one is also resident (though not habitually resident) in another. *Id.* at 41. The *Marinos* court stated:

81 The question to be determined is the location of the habitual centre of the wife's interests. The difficulty is presented by the fact that whereas the centre of many of her interests was indubitably this country, the centre of at least some of her interests was equally obviously Greece. On the one hand the centre of her employment and education interests was plainly in this country, the land of her birth, the country to which she retained the emotional commitment which she never had to Greece, and the country with which she retained all the other links identified by Mr Castle. As against that, the centre of her emotional, personal and family interests was equally plainly Greece, the country where her children lived—the children who not surprisingly were, in her own words, "the centre of my life."

82 At the end of the day all these various factors, some pointing in one direction, some in the other, have to be balanced and evaluated with a view to identifying the habitual centre of the wife's interests. One cannot, as it seems to me, say a priori that any one factor is of more or less intrinsic weight than another. How the balance comes to be struck must depend upon all the factors in issue in the particular case, the task for the judge being to attribute to each of those factors the weight which in his estimation attaches to it in the particular circumstances of the particular case. In one case the factor of employment may weigh more heavily than in another superficially similar case. In another case the location of the matrimonial home may carry particular weight.

83 Acknowledging that the factors which are in play in this case point very sharply to starkly opposing conclusions, and recognising that they are, when all is said and done, very evenly balanced, I am nonetheless persuaded that the overall balance points to this country as being the habitual centre of the wife's interests. Evaluating all those interests together and in the round, the centre of gravity is located in this country and not in Greece. If the wife was a mother she was also a career woman, and if her children were in Greece both her current career and her planned future career were in this country.

84 I find therefore that the wife was both resident and habitually resident in this country at all material times from (say) September 2004 onwards. On this basis she was entitled to petition in this country when she issued her petition on 1 February 2007.

85 Even if I am wrong in this, there is, in my judgment, another basis upon which the wife is entitled to succeed. She was, for the reasons I have already given, resident in this country at all times from September 2004 onwards, in particular, resident in this country for at least six months before she issued her petition on 1 February 2007. But she was also, in my judgment, habitually resident in this country on 1 February 2007 even if not before then.

86 It is important to remember the circumstances in which the wife returned to this country on 31 January 2007. She had severed her links with Greece. She was returning to this country with her children, intending to make it her, and their, permanent home. She had arranged schools for them and taken steps to obtain early vacant possession of the Chiswick property. Moreover, and as Sumner J found, she and the children came with the husband's consent, not merely consent to them coming over here but consent to them staying here. I can see no reason why, in these circumstances, she did not immediately acquire a habitual residence in this country upon her return here on 31 January 2007 even if, immediately prior to that, she was in fact habitually resident in Greece.

87 It is of course trite learning under our domestic law that although habitual residence can be lost in a day it cannot be gained in a day. There must be an appreciable period of residence before it becomes habitual, though that period need not be very long. It can certainly be measured in weeks rather than in months and in an appropriate case it can probably be measured in nothing more than days. But here, of course, we are concerned with a period of less than 24 hours, for the wife returned on 31 January 2007 and issued her petition the following day.

88 However, ... the approach is quite different as a matter of ECJ law. As

... so far as concerns the Regulation one can in appropriate circumstances establish habitual residence very quickly, in my judgment very quickly indeed. As the Court said in *Swaddling v. Adjudication Officer* (Case C–90/97) [1999] ECR 1–01075, [1999] 2 FLR 184, at para [30], the length of residence is not an intrinsic element of the concept of habitual residence in this context.

89 In a case such as this—where someone, as in the case of the wife here, is undertaking a planned, purposeful and permanent relocation from one country to another—there is nothing in Community law to prevent the acquisition of a new habitual residence contemporaneously or virtually contemporaneously with the loss of one's previous habitual residence. In a situation such as that in which the wife found herself on 31 January 2007 there is nothing in Community law to prevent the conclusion that just as (on this hypothesis) she lost her habitual residence in Greece as the aircraft in which she and the children were travelling took off from Greece, in the same way she acquired a new habitual residence in this country as the aircraft touched down at Heathrow.

90 In my judgment, the wife was habitually resident in this country for the purposes of the Regulation on 1 February 2007 even if she had not been prior to the day before.

*Jane Elizabeth Marinos v. Nikolaos Lykourgos Marinos,* [2007] EWHC 2047 (High Court of Justice Family Division 2007).

## C. Objective Factors Considered by U.S. Courts

The factors by which European courts determine the location of an individual's center of interests are similar to the factors considered by U.S. courts in determining the location of an individual's domicile. Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile. *State of Texas v. State of Florida,* 306 U.S. 398, 59 S.Ct. 563, 83 L.Ed. 817 (1939). "Domicile" is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there. *Id.* One acquires a "domicile of origin" at birth, and that domicile continues until a new one (a "domicile of choice") is acquired. *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). "An individual is domiciled in the place where he has his true, fixed, and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom." *Deep Marine Technology, Inc. v. Conmaco/Rector, L.P.,* 515 F.Supp.2d 760 (S.D.Tx.2007) (citing *Mas v. Perry,* 489 F.2d 1396, 1399 (5th Cir.1974)). To defeat the presumption of continuing domicile and establish a new domicile that applies whenever a person relocates, a person must demonstrate residence in a new state, and an intention to remain in that state indefinitely. *Id.* (citing *Acridge v. Evangelical Lutheran Good Samaritan Soc'y,* 334 F.3d 444, 448 (5th Cir.2003)).

In *Coury v. Prot,* 85 F.3d 244 (5th Cir. 1996), the Fifth Circuit considered various factors in evaluating the location of a person's domicile:

A change in domicile typically requires only the concurrence of: (1) physical presence at the new location and (2) an intention to remain there indefinitely; or, as some courts articulate it, the absence of any intention to go elsewhere. Thus, a person who has the clear intent to change domicile does not accomplish the change until he is physically present in the new location with that intent. On the other hand, mere presence in a new location does not effect a change of dom-

icile; it must be accompanied with the requisite intent. In most cases, the difficult issue is not presence but whether the intent to change domicile can be shown.

A person's domicile persists until a new one is acquired or it is clearly abandoned. There is a presumption in favor of the continuing domicile which requires the party seeking to show a change in domicile to come forward with enough evidence to that effect to withstand a directed verdict. While some opinions seem to imply that the burden of persuasion rests with the party attempting to show a change of domicile, this is an overstatement. The proper rule is that the party attempting to show a change assumes the burden of going forward on that issue. The ultimate burden on the issue of jurisdiction rests with the plaintiff or the party invoking federal jurisdiction.

In determining a litigant's domicile, the court must address a variety of factors. No single factor is determinative. The court should look to all evidence shedding light on the litigant's intention to establish domicile. The factors may include the places where the litigant exercises civil and political rights, pays taxes, owns real and personal property, has driver's and other licenses, maintains bank accounts, belongs to clubs and churches, has places of business or employment, and maintains a home for his family. A litigant's statement of intent is relevant to the determination of domicile, but it is entitled to little weight if it conflicts with the objective facts.

Most courts regard domicile as presenting a mixed question of law and fact. Nevertheless, in practice, the district court's determination of domicile is reviewed on appeal as a question of fact; it will be upheld unless "clearly erroneous."

*Coury v. Prot*, 85 F.3d 244, 250–251 (5th Cir.1996). The 5th Circuit agreed with the lower court's determination that Prot was domiciled in Texas when the action was initially filed and when he removed it to federal court. The district court found that Prot established a domicile in Texas in 1987, and that although he had physically moved himself and his family to France in 1991, to avoid transatlantic commuting, the evidence failed to show an essential requisite of a change in domicile, that is, that Prot had formed an intention in 1991 or 1992, to remain in France indefinitely. *Id.* at 252. In view of Prot's repeated statements that he and his wife did not intend to stay in France indefinitely and that they always intended to return to Texas, the court concluded that the district court's findings were not clearly erroneous. *Id.*

### D. Objective Factors Considered by Israeli Courts

The factors considered by European courts in determining an individual's centre of interests and by U.S. courts in determining the location of an individual's domicile are similar to the factors considered by Israeli courts to decide the location of an individual's center of life. Under Israeli tax law, an individual will be considered an Israeli resident if the center of his life is located in Israel. George A. Rosenberg, *Israeli Tax Reform*, J. Int'l Tax'n 31, 2003 WL 1871011 *31 (April 2003) (citing the Law to Amend the Income Tax Ordinance (No. 132)—2002.) The center-of-life test takes into consideration the individual's financial, economic, and social ties including: the location of his permanent home, the place of residence of the individual and his family, the location of his regular activities, jobs, assets, investments, clubs, unions, and institutions of which he is a member. *Id.*

The National Insurance Institute of Israel, which administers social security benefits, considers a resident of Israel is a person whose life is centered in Israel.[4] The criteria by which the National Insurance Institute of Israel determines residence include "permanent place of residence, place at which the family is staying, place of the children's education, main place of work, place of learning." [5]

The concepts of residency and of an individual's center of life under Israeli law are explained in Israel Doron and Tal Golan, *Aging, Globalization, and the Legal Construction of "Residence": the Case of Old-age Pensions in Israel,* 15 Elder L.J. 1 (2007). The article states:

> In the National Insurance Law, and indeed in Israeli legislation as a whole, there is no definition of the term "resident." Accordingly, the burden of imbuing the concept with meaning has been borne mainly by case law, through numerous rulings passed down over the years. The basic definition developed over the years has been that a person's residence is the place that constitutes that person's "center of life." The test of the center of life primarily includes an objective dimension (the sum total of objective data actually indicating the place to which the individual is most closely attached) with limited weight given to the subjective dimension (the place to which the individual personally feels most strongly attached).

15 Elder L.J. 1 at 16 (citing CA 8313/02 *Halamish v. Nat'l Ins. Inst.* [2002] IsrSC 44(4) 432). Further, quoting the National Labor Court in Nat'l Labor Court Rulings, 1987, 14–0, *Yalouz v. Nat'l Ins. Inst.;* 32(2), 208, the article states:

Determination of the question as to whether a person is a resident of Israel "will come from the totality of circumstances ... that, in the final reckoning, will establish the actual affinity to Israel."... The determination of the "affinity," the place "where he lives," and which "is his home" is effected in accordance with the factual infrastructure and the evaluation of the facts, with reference to the totality of circumstances.

15 Elder L.J. 1 at 17 (citing Nat'l Labor Court Rulings, 1987, 14–0, *Yalouz v. Nat'l Ins. Inst.;* 32(2), 208.) The article continues:

> It appears that there is a considerable degree of discretion in determining when a person is a resident, as courts are able to take into account numerous variables unique to each specific case. The tests employed by the courts look at numerous economic, familial, or even cultural factors: where the citizen purchased his apartment, where he works (both in terms of statutory status—where he obtained his work permit—and in terms of his actual work), whether the citizen has any general economic connections to Israel and, if so, what the nature of this connection is.

15 Elder L.J. 1 at 17.

Factors Israeli courts consider as evidence that a person's center of life is outside Israel include: (1) the possession of property abroad or the absence of property in Israel (2) possession of United States passports and "green cards" indicating that one's center of life is in the United States, (3) possession of a permit for U.S. residency and employment, and (4) the location of one's family abroad. 15 Elder

---

**4.** *See* National Insurance Institute of Israel, NII English Home Page > Definitions and Terms, Definitions Applicable to Insurance Contributions, Resident of Israel, http://www. btl.gov.il/NR/exeres/FE8AAEC6–6D04–4956–8 C5F–835B2D63FF39.

**5.** *Id.*

L.J. 1, 17–23. These factors indicate severed connections with Israel. *Id.* Conversely, neither ownership of an apartment in Israel, nor the existence of an active bank account, constitutes sufficient evidence of an individual's connection with Israel to preserve an individual's affinity to the country. 15 Elder L.J. 1 at 20. Furthermore, "the Entry to Israel Regulations ... establish that, for the purpose of examining the validity of an entry visa to Israel and a temporary residency permit, a person shall be considered to have settled in a country other than Israel if he or she has spent a period of seven years outside Israel and if they have received a permanent residency permit or citizenship in another country." 15 Elder L.J. 1 at 17 (citing Entry to Israel Regulations, 5734–1974, KT 3201.)

In *Harosh,* Cr. C. (B.S.) 2484/99, the Israeli court determined that "residency" for purposes of application of the Extradition Act (Amendment No. 6) of 1999, is determined by reference to past and present, factual and emotional, connections, including "subjective ones that constitute, in their accretion, the centrality of a person's life." Abraham Abramovsky and Jonathan I. Edelstein, *The Post–Sheinbein Israeli Extradition Law: Has it Solved the Extradition Problems Between Israel and the United States or Has it Merely Shifted the Battleground?,* 35 Vand. J. Transnat'l L. 1, 45–46 (2002). While intent is not controlling as to whether a person's "center of life" is in Israel, intent may explain or illuminate the objective facts relevant to a determination of the center of a person's life. 35 Vand. J. Transnat'l L. 1 at 47. Thus, the fact that Harosh had fled to Israel in order to escape U.S. justice might raise doubts about his real intentions and may "raise the suspicion that the stay in Israel is a temporary one, until the storm blows over and not later." 35 Vand. J. Transnat'l L. 1 at 48, n. 348 (quoting Cr.

C. (B.S.) 2484/99, *Attorney General v. Harosh,* slip op. at 50–51.) The *Harosh* court found that, when an Israeli citizen lives abroad, his center of life gradually shifts away from Israel to the country where he resides. 35 Vand. J. Transnat'l L. 1 at 49 (citing Cr. C. (B.S.) 2484/99, *Attorney General v. Harosh,* slip op. at 54–55.) At a certain point, his status changes from a resident of Israel to a resident of the foreign country, and, if this point is passed, he must gradually re-establish his residency upon return to Israel. *Id.* The court determined that Harosh's prolonged absence from Israel, coupled with the fact that he had married a U.S. citizen and obtained a green card in the United States, meant that his center of life had shifted to the United States between 1991 and 1998. 35 Vand. J. Transnat'l L. 1 at 49 (citing Cr. C. (B.S.) 2484/99, *Attorney General v. Harosh,* slip op. at 58.) The court found that Harosh had not shifted his center of life back to Israel in the eleven months he had resided in Israel prior to the extradition request. 35 Vand. J. Transnat'l L. 1 at 49 (citing Cr. C. (B.S.) 2484/99, *Attorney General v. Harosh,* slip op. at 59–60, 63.) Therefore, the court concluded, although "at present there are, in fact, ties connecting the respondent to Israel, these are insufficient to bestow upon the respondent the status of an Israeli resident as defined in the Extradition Law." 35 Vand. J. Transnat'l L. 1 at 49 (citing Cr. C. (B.S.) 2484/99, *Attorney General v. Harosh,* slip op. at 63.) The Israeli Supreme Court concurred in the lower court's reliance on the "center of life" test to determine residency, agreeing that Harosh's center of life had moved to the United States during his absence from Israel and that he had not re-established residency during the short period of his return. 35 Vand. J. Transnat'l L. 1 at 52 (citing Cr. A. 3025/00, *Harosh v. State of Israel,* slip

op. at 23–29 (Isr.2000)). Further, while Harosh's flight from justice did not preclude a finding that he was a resident of Israel, Harosh had only begun "a process of integration into the life of Israel," that "ha[d] not yet been completed" at the time his extradition was requested. 35 Vand. J. Transnat'l L. 1 at 53 (citing Cr. A. 3025/00 at 27, 29.)

In H.C. 129/63, *Matalon v. Regional Rabbinical Court of Tel Aviv–Yafo*, 17(3) P.D. 1640, 1644 (Isr.1963), the Israeli Supreme Court stated, "[e]ven an improper motive is proper as far as decision on [the] question [of residency] is concerned, but only if [the petitioner's] true and sincere desire is to remain in the new country, and not merely to live and reside in it until the storm has passed." 35 Vand. J. Transnat'l L. 1 at 47, n. 350 (quoting *Matalon*, 17(3) P.D. at 1644.)

Although the Israeli Supreme Court in C.A. 657/76, *Harashut Hamusmehet Letzora hok Nehey Redifot Hanazim v. Hasdai*, 32(1) P.D. 778, 781 (Isr.1978), recognized that a person's intention to return to Israel may remain with him throughout his stay abroad, the court held in H.C. 282/88, *Awad v. Minister of the Interior*, 42(2) P.D. 424 (Isr.1988), that Awad's intention, during his absence from Israel always to return to Israel was not controlling for purposes of determining his residency in connection with his application to renew his Israeli identity card. 35 Vand. J. Transnat'l L. 1 at 46–47. Awad left Israel in 1970 to study in the United States, obtained a U.S. green card and, in 1978, obtained U.S. citizenship. 35 Vand. J. Transnat'l L. 1 at 46–47. Awad had visited Israel only three or four times between 1970 and 1983 (even though he made more frequent trips to Israel during 1984 to 1988 as he became active in the movement against the Israeli occupation of the West Bank and Gaza). 35 Vand. J. Transnat'l L. 1 at 47. The Israeli Supreme Court held regarding Awad:

It may be that in [Awad's] heart of hearts he sought to return to Israel. But the decisive criterion is the reality as it actually occurred. Based on this criterion, at a certain stage the petitioner moved his center of life to the United States, and he may no longer be viewed as one who resides permanently in Israel.

35 Vand. J. Transnat'l L. 1 at 47 (citing H.C. 282/88, *Awad v. Minister of the Interior*, 42(2) P.D. 424, 434 (Isr.1988)). Likewise, in C.A. 4127/95, *Zelkind v. Beit–Zayit*, 52(2) P.D. 306, 319 (Kr.1998), "it can be said that the duration of absence from the fixed place of domicile can serve as a significant indication ... and can point to the severance of connection with the fixed abode." 35 Vand. J. Transnat'l L. 1 at 47 (citing C.A. 4127/95, *Zelkind v. Beit–Zayit*, 52(2) P.D. 306, 319 (Kr.1998)).

## IV. Review of Evidence, Consideration of Factors, and Further Findings of Fact

### A. Lavie Negotiates Settlement with Ran on Behalf of Bank Hapoalim

Prior to 1997, Yuval Ran was CEO of a publicly traded Israeli company known as Israel Credit Lines Supplementary Financial Services, Ltd.("ICL"). Zuriel Lavie testified that in the first quarter of 1997, Bank Hapoalim approached Lavie to work with the bank to negotiate with Ran regarding his personal debts with Bank Hapoalim. According to Lavie, the bank wanted to find a way to settle with Ran. Lavie had settlement meetings with Ran's attorney and, Lavie recalls, at least two meetings with Ran and the bank together, "to see how we can settle and how we can resolve the debt." Transcript pp. 17–18. Lavie testified that in April 1997, either Ran or his attorneys told Lavie that Ran

was leaving Israel for a short business trip and would come back, but Ran never returned. Transcript p. 18.

## B. Ran Leaves Israel and Transfers the Center of His Life

In April 1997, Ran left Israel and has never returned. After Ran's departure from Israel, Bank Hapoalim Ltd, in June 1997, sought an ex parte temporary attachment order over Ran's assets. On July 10, 1997, the court appointed Zuriel Lavie as temporary receiver over Ran's assets.

According to Lavie's report to the Israeli court, Ran's departure from Israel and relocation to the United States, was so genuine and permanent that legal consequences attached under Israeli law. Ran's departure from Israel in April 1997, according to Lavie, constitutes an "act of bankruptcy" and is a permanent transfer of Ran's center of life away from Israel. Lavie Ex.1 at ¶¶ 21.5, 26. Lavie states, "... Lavie was appointed temporary receiver over [Ran's] assets (CA 2448/97) after [Ran] committed an act of bankruptcy and during April 1997 left Israel with his family, leaving behind him huge debts on a scale of tens of millions of new Israeli shekels." Lavie Ex. 1 at ¶ 26. "In addition, [Ran's] decision to permanently transfer the center of his life abroad only reinforces the Trustee's argument that the Debtor committed an act of bankruptcy and does not intend to return to Israel." Lavie Ex. 1 at ¶ 21.5. Lavie's report states that evidence that Ran's departure from Israel was done with no intention of returning is established by: (1) ICL's decision at the end of May 1997, to appoint a co-CEO for the company in addition to Ran, as that "delegation of the CEO's powers to another person clearly shows" that Ran "had abandoned the country for an unlimited period of time;" (2) that "on 4th June 1997 Zvika Dgani, who served as director of [Navigator Investments Ltd.] gave notice of his resignation from the Company's board of directors" for the reason, "In light of recent developments, Mr. Yuval Ran's stay abroad and the lack of certainty as to if and when he will return, I do not consider it possible to continue serving as director of the company;" (3) "the change of personnel on the board of directors of Passport Ltd and Oil Exploration Ltd," Ran's place on those boards of directors "being taken by Mr. Eyal Gibor, CPA, after [Ran] resigned on 5th May 1997;" and (4) "the meeting that took place between [Ran] and his business partners in Rome, in May 1997," in which "[i]nstead of [Ran] attending the planned meeting in Israel-where all the parties were, all the parties had to make the effort to go to Rome, where they met with [Ran]." Lavie Ex. 1, ¶¶ 21.1., 21.2, 21.3, and 21.4.

The Courts notes that the "act of bankruptcy" to which Lavie attaches significance is not Ran's default on millions in NIS debt, but is, instead, Ran's leaving Israel with no intention of returning while he owes creditors there. *See* Israel Treiman, *Acts of Bankruptcy: A Medieval Concept in Modern Bankruptcy Law*, 52 Harv. L.Rev. 189, 192–197 (1938–1939). The Tremain article explains the origins of the phrase, "an act of bankruptcy":

> As one inspects the numerous laws dealing with defaulting debtors in Continental countries during the medieval period: the remarkable frequency with which they speak of such debtors as "fugitives" is striking. Indeed, in many localities the term *fugitivi*, apparently older than *bancarotti*, seems to have been used synonymously with the latter. Apparently it was the regular custom on the Continent for a failing debtor to flee from his creditors. The explanation probably lies in two facts: first, the notorious harshness of medieval Continental laws in their treatment of all

insolvent debtors, regardless of their honesty; second, the ease with which it must have been possible, considering the lack of communication facilities as well as the political barriers separating the mercantile communities of that time, for a debtor who had fled to elude pursuit by his creditors. Voluntary flight in those days must have offered the same hope of rehabilitation which voluntary bankruptcy provides at the present time. In any event, it seems that by the middle of the sixteenth century, an act either of flight from the country or, at least, withdrawal from the market place (foro cedere) was regarded as an essential element in the legal definition of bankruptcy. Having made that act voluntarily, the debtor was naturally said to have made his bankruptcy. In short, conduct, not financial embarrassment, was the gist of the offense.

Thus when the English legislator toward the middle of the sixteenth century turned his attention to a bankruptcy law, he had for his models a multitude of contemporary Continental laws in which he observed a striking unanimity in the use of the phrase "persons who make bankrupt"—*bancham ruptam facientes, qui font banqueroute.* How directly these Continental laws influenced the shaping of the first English statute on bankruptcy may be seen from the fact that a few months before its passage a bill was introduced in the House of Lords against "Merchants that Run Away With Other Men's Goods," a title that is practically a literal translation of a phrase appearing in the contemporary Spanish Code on bankruptcy—*se ausentan con caudelas agenos.*

. . . .

English bankruptcy law thus was from its inception grounded in the notion that the status of bankruptcy commenced with some positive and intentional act on the part of the debtor, and that, such an act having been committed, the solvency of the debtor was unimportant. As in its Continental prototype, attention was riveted solely upon the debtor's conduct.

. . . .

The debtor's conduct, not his financial condition, is still the technical basis of his bankruptcy.

Israel Treiman, *Acts of Bankruptcy: A Medieval Concept in Modern Bankruptcy Law,* 52 Harv. L.Rev. 189, 192–197(1938–1939).

Ran's transfer of his center of life from Israel to the U.S. served as the basis for attachment of his Israeli assets and appointment of Lavie. In addition, as one who had transferred his center of life away from the State of Israel, Ran would no longer be entitled to Israeli social security benefits, such as unemployment and old age compensation payments, to treatment as a resident under Israeli tax law, and as a non-resident, would be subject to denial of a return entry visa. *See* Abraham Abramovsky and Jonathan I. Edelstein, *The Post–Sheinbein Israeli Extradition Law: Has it Solved the Extradition Problems Between Israel and the United States or Has it Merely Shifted the Battleground?,* 35 Vand. J. Transnat'l L. 1, 45–46 (2002) (and the cases cited therein); George A. Rosenberg, *Israeli Tax Reform,* J. Int'l Tax'n 31, 2003 WL 1871011 *31 (April 2003) (citing the Law to Amend the Income Tax Ordinance (No. 132) 2002); Israel Doron and Tal Golan, *Aging, Globalization, and the Legal Construction of "Residence": the Case of Old-age Pensions in Israel,* 15 Elder L.J. 1 (2007) (and the cases cited therein). *See also* National Insurance Institute of Israel, NII English Home Page > Definitions and Terms, Definitions Applicable to Insurance Contributions, Resident of Israel, http://www.btl.

gov.il/NR/exeres/FE8AAEC6–6D04–4956–8C5F–835B2D63FF39.

While maintaining the position before the Israeli court that Ran's relocation to the United States is permanent for purposes of Israeli bankruptcy law, Lavie contends that Ran's relocation should not be considered significant or permanent for purposes of U.S. bankruptcy law. Despite the legal consequences under Israeli law resulting from Ran's transfer of the center of his life from Israel to the United States, Lavie contends that Ran's relocation does not equate to a transfer to the U.S. of Ran's center of main interests because when Ran left Israel: (1) he owed debts to Israeli creditors, (2) he left as a "fugitive" to escape the reach of Israeli justice, (3) Ran continued to manage ICL from the United States, (4) Ran is guilty of forum shopping, (5) Ran's creditors chose Israel as their favored jurisdiction in which to initiate bankruptcy proceedings against Ran, and (6) the Court should defer to the jurisdiction of the Israeli bankruptcy court under principles of comity.

## C. Lavie's Actions As Temporary Receiver

The Court notes that throughout the trial, Lavie and his counsel used the terms "receiver," "trustee," and "liquidator" interchangeably without distinction as to their powers and duties under Israeli law. *See eg.* Transcript p. 68, "And I don't know if I'm using the right terms "liquidator," "trustee" and they seem to use them interchangeably ..." It is apparent to the Court from Lavie's testimony, that Lavie understood his role as receiver to be to continue to act on behalf of Bank Hapoalim to collect its debt from Ran, rather than to act on behalf of all creditors to collect and preserve Ran's assets for the benefit of all.

Lavie purports to have aggressively investigated Ran, his assets, his business associates, and his family members while collecting and liquidating assets during his appointment as temporary receiver acting on behalf of Bank Hapoalim. Lavie's report to the Israeli court on the status of Ran's bankruptcy as of January 2007, states:

29. Upon his appointment the temporary receiver began acting intensively in order to trace assets owned by the debtor, approaching every relevant entity and demanding that they give him assets and rights of the debtor. Thus, inter alia, the temporary receiver turned to banks, insurance companies, the stock exchange, the various companies in which the debtor held shares and other entities and bodies directly and indirectly related to the debtor and his business.

30. In order to expand the scope of the temporary receiver's acts to trace assets of the debtor and for the purpose of streamlining the temporary receivership proceedings, the honorable court allowed the temporary receiver to summon for investigation any relevant entity in respect of which the Official Receiver had reasonable basis to assume had information and/or documents and/or anything else connected with the debtor's assets and/or was able to otherwise assist the temporary receiver in tracing assets of the debtor (ca 2791/97).

31. Indeed, in the framework of the investigative powers vested in him by the honorable court, the temporary receiver summoned for investigation various entities close to the debtor whom the official receiver believed might have information regarding the debtor's assets. Thus, for example, summoned for investigation were the debtor's brother, Yoav Ran, his business partners, Messrs Nathan Torner and Abraham Goldreich, Ms. Dina Claude, who served as Credit

Lines' comptroller and Mr. Eyal Gibor, who served as co-ceo of Credit Lines together with the debtor.

32. In consequence of the action taken by the temporary receiver in order to trace assets of the debtor, he was able to seize the following assets:

32.1 21,135 shares of Agri–Invest Ltd, a company whose shares are traded on the Tel Aviv stock exchange, the market value of which, correct as at 22nd February 2000, was NIS 316,602 (NIS 14.98 per unit) (hereinafter referred to as "the shares."). The consideration was deposited in the trust account.

32.2 a lien over the rights in the debtor's residence at 9 Barazani Street, Tel Aviv, known as block 6631, parcel 208/62 (hereinafter referred to as "the apartment").

Lavie Ex. 1.

## D. More Settlement Negotiations

Lavie testified that after his appointment as receiver, or, in his words, as "temporary trustee," he did not hear from Ran, but continued to negotiate with Ran's attorney until the middle of 1998, in attempts to see if Ran "can finish and settle his debt to the bank." Transcript pp.27–28. Ran's attorney had offered "some settlement ideas and we had to check them. There were negotiations." Transcript p. 28.

On August 31, 1998, Bank Hapoalim took judgment against Ran, in the amount of NIS 11,750,531. According to Lavie, on November 18, 1998, the court granted a permanent receivership order against Ran and appointed Lavie as special administrator on behalf of the Official Receiver, who served as the permanent receiver. Lavie Ex. 1 at ¶ 27.

## E. Bankruptcy Proceedings Are Filed Against ICL

More than a year after Ran's re-location to the United States, on July 12, 1998, Bank Leumi Le–Israel Ltd instituted bankruptcy proceedings against ICL, bankruptcy case no. 1218/98. A year after initiation of that proceeding, in August 1999, the Israeli court before whom the corporate bankruptcy is pending, appointed Yitzhak Miron and Haim Rabinowitz as joint liquidators. Miron and Rabinowitz also serve as liquidators for IsraelCredit Lines (Center) Ltd and Israel Credit Lines (A.S.) Ltd.

## F. Ran is Declared a Bankrupt

Two and one-half years after Ran left Israel and transferred the center of his life to the United States, on October 28, 1999, an Israeli court issued an order declaring Ran bankrupt and appointing Lavie as trustee for Ran's assets. Lavie Ex. 1 at ¶ 28. By the time the bankruptcy order was granted: Ran had left Israel and had re-settled in the United States; Ran had resigned from his corporate positions and left all of his Israeli business interests behind; and his former businesses were under the Israeli court's supervision and control in a separate corporate bankruptcy proceeding.

## G. Lavie's Actions As Trustee

In contrast to his relative aggressiveness in investigation and collection activity as temporary receiver on behalf of Bank Hapoalim, Lavie testified that since his appointment as bankruptcy trustee, he has done little and agreed several years ago that the joint liquidators of ICL should take the lead on behalf of the creditors:

... we made some attempts on a minor level then there were a period of two to three years in which we agreed or—in which we agreed with the liquidator that

he will take care of that because there are some—since the liquidator has major problems, he has some claims of like $500 million—shekels—Israeli shekels. Transcript pp. 32–33. Lavie testified that he has reviewed claims asserted in Ran's bankruptcy.

## H. Lavie Contends Ran's Center of Main Interests is Determined by the Location of Lawsuits and Debts

Some years after Ran had relocated to the United States, the joint liquidators of ICL filed suit against Ran and other individuals in the Tel Aviv–Jaffa District Court, civil file no. 2602/01, pending before the Honorable Ruth Ronen. Ran has hired counsel to defend that lawsuit.

Lavie testified that claims have been asserted in Ran's bankruptcy by Bank Hapoalim Ltd., Pozeilov Pinchas, Pozeilov Ben Zion, American Israeli Bank, Ltd., Israel Discount Bank Ltd, United Mizrahi Bank of Israel Ltd, Bank Leumi Le–Israel Ltd, taxing authorities and the joint liquidators of ICL. Lavie testified that claims against Ran, apart from the lawsuit filed by the ICL joint liquidators, total NIS 60 million. In addition to that, the ICL liquidators seek NIS 560 million in connection with their lawsuit.

According to Lavie, the existence in Israel of the ICL lawsuit and the bankruptcy claims constitute evidence that Ran's center of main interest is in Israel compelling this Court to consider the principles of comity and deference to the Israeli court as overriding any other consideration. "Otherwise, anybody could just up and leave their country of origin, leave behind their business and bankruptcy and say,

'well, now I live next door and you can't do anything.' "

Although Lavie strenuously argues in favor of consideration of the location of Israeli creditors, he is silent as to the weight to be given to debts Ran has incurred since his move here 10 years ago, such as his home mortgage. Lavie urges the Court to consider the location of creditors left behind in Israel, but gives no weight to the consideration that those creditors have exclusive claim to the Israeli assets and businesses that Ran left behind.

■ Lavie urges the Court to recognize the Israeli proceeding to effect the principles of comity and deference encompassed in Chapter 15 by deferring to the jurisdictional choice of the Israeli creditors. To the contrary, these principles are incorporated into Chapter 15 in § 1507, available only if recognition is first granted.[6]

In denying recognition to a foreign proceeding as not pending in a country where the debtors had their center of main interests or where they have an establishment, the court in *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122 (Bankr.S.D.N.Y. 2007), stated:

The Petitioners' reliance on the discretionary and flexibility attributes of caselaw under former section 304 of the Bankruptcy Code is misplaced. While much of the jurisprudence developed under section 304 is preserved in the context of new section 1507, section 304 did not have a recognition requirement as a first step.... Chapter 15, on the other

---

**6.** "The decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by section 304c of the Bankruptcy Code. The requirements of this section, which incorporates the definitions in section

1502 and sections 101(23) and (24), are all that must be fulfilled to attain recognition." Hon. Burton R. Lifland, Una O'Boyle, Esq. and Erin Healy Mautner, Esq., "Chapter 15 of the United States Bankruptcy Code: An Annotated Section–By–Section Analysis."

hand, imposes a rigid procedural structure for recognition of foreign proceedings as either main or nonmain and thus the jurisprudence developed under section 304 is of no assistance in determining the issues relating to the presumption for recognition under chapter 15.

*In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122 (Bankr.S.D.N.Y.2007). Affirming the lower court's ruling on appeal, the district court stated:

Appellants argue that Chapter 15 "was enacted to foster comity," AOB 15, and the courts should therefore apply Chapter 15 "pragmatically, based on their understanding that recognition should be withheld only in very limited circumstances." AOB 3. This argument cannot overcome the plain language of Chapter 15.

Chapter 15 and the Model Law are designed to optimize disposition of international insolvencies by facilitating appropriate access to the court system of a host country (the United States, in the case of Chapter 15) by a representative of an insolvency proceeding pending in a foreign country. See § 1521; Model Law art. 21. If access is granted, then a wide range of relief from the host country's courts may be available. See § 1521; Model Law art. 21. "Recognition," the statutory parlance for such access, is distinct from the relief that may be granted post-recognition. Recognition turns on the strict application of objective criteria. See § 1517; Model Law art. 17. Conversely, relief is largely discretionary and turns on subjective factors that embody principles of comity. See, e.g., §§ 1507, 1521, 1525; Model Law art. 7, 21, 25. If recognition is refused, then the bankruptcy court is authorized to take any action necessary to prevent the U.S. courts from granting comity or cooperation to the foreign representatives. See § 1509(d).

Requiring recognition as a condition to nearly all court access and consequently as a condition to granting comity distinguishes Chapter 15 from its predecessor section 304. Prior to the enactment of Chapter 15, access to the United States courts by a foreign representative was not dependent on recognition; rather, all relief under section 304 was discretionary and based on subjective, comity-influenced factors. See Decision, 374 B.R. at 126; see also *In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 46 (Bankr.S.D.N.Y.2008); Jay Lawrence Westbrook, Locating the Eye of the Financial Storm, 32 Brooklyn J. Int'l L. 1019, 1024 (2007); Daniel Glosband, SPhinX Chapter 15 Opinion Misses the Mark, 25 Am. Bankr.Inst. J. 44, 45 (Dec/Jan.2007). By establishing a simple, objective eligibility requirement for recognition, Chapter 15 promotes predictability and reliability. The considerations for post-recognition relief remain flexible and pragmatic in order to foster comity and cooperation in appropriate cases.

The objective criteria for recognition reflect the legislative decision by UNCITRAL and Congress that a foreign proceeding should not be entitled direct access to or assistance from the host country courts unless the debtor had a sufficient pre-petition economic presence in the country of the foreign proceeding. See House Report at 110; § 1509(b)(3). If the debtor does not have its center of main interests or at least an establishment in the country of the foreign proceedings, the bankruptcy court should not grant recognition and is not authorized to use its power to effectuate the purposes of the foreign proceeding. See House Report at 113; Guide paras. 73, 75, 128. Implicitly, in such an instance

the debtor's liquidation or reorganization should be taking place in a country other than the one in which the foreign proceeding was filed to be entitled to assistance from the United States.

Both the plain language and legislative history of Chapter 15 thus requires a factual determination with respect to recognition before principles of comity come into play.

*In re Bear Stearns High–Grade Structured Credit,* Slip Copy, 2008 WL 2198272 *6–8 (S.D.N.Y. May 27, 2008).

 By arguing comity without satisfying the conditions for recognition, Lavie urges this Court to ignore the statutory requirements of 11 U.S.C. § 1517. In accordance with *In re Bear Stearns High–Grade Structured Credit,* comity is not an element of recognition; it is rather, a consideration once recognition is granted.

## I. Lavie Contends Ran's Center of Main Interests is Determined By Ran's Motive

Lavie asserts that Ran's motive for leaving Israel is a factor to be considered in determining Ran's center of main interests. Lavie contends that Ran is a fugitive escaping the reach of Israeli bankruptcy court orders. During argument, Lavie's counsel characterized Ran as a "fugitive" from Israeli justice.[7] As to the origins of the use of the term "fugitive" in reference to bankrupt individuals see Israel Treiman, *Acts of Bankruptcy: A Medieval Concept in Modern Bankruptcy Law,* 52 Harv. L.Rev. 191 (1938–1939).

7. Lavie's counsel persistently characterized Ran's application for cross-examination by video conference as evidence that Ran is a "fugitive" from the Israeli bankruptcy system who remains in the United States to avoid answering questions concerning his bankruptcy and to avoid Israeli bankruptcy procedure:

> ... it's not our burden to prove that Israel is a habitual residence..... it is not disputed that Mr. Ran lives in Houston. I do not know whether that means it's a habitual residence because the evidence also shows that the reason he came here is to flee from creditors and from a court order that required him to be there to answer questions. His own affidavit and motion recently filed in Israel which are in evidence state that he doesn't want to go back to Israel because he's afraid of being held there for questioning in the bankruptcy. So the reason he's here is to avoid the procedure there. I don't know that that makes him a habitual resident of Houston. Maybe it just makes him a habitual fugitive to Houston.

Transcript p.35.

> However, if I try to look at the big picture, I think that what Mr. Ran's view is at base is that the statute allows a fugitive from another country's bankruptcy system to move here—I'm talking about individuals ... for an individual to move here, the next day say

> this is his residence, 'I'm a habitual resident because my children are in school here and I coach Little League or whatever—and therefore the reach of the other bankruptcy court cannot get to me.'

Transcript pp. 58–59.

> Now, I'm not sure that Houston is where Mr. Ran habitually resides because the evidence is that he left Israel rather than deal with his creditors. Now, it may be that some of his creditors got rough and burned his car—and that's the only thing that apparently was reported to anybody in 1997—but it was still leaving because of—he didn't want to face his creditors. It wasn't because he liked the weather here in Houston. He left.

Transcript p. 64.

> He says specifically in a motion filed within the last several months in Israel, that the reason he doesn't want to come back to Israel is the bankruptcy court order and he's afraid he's going to be detained to give evidence in that case. So he doesn't want to return for that reason. I don't know if a person under that kind of legal restraint who can't go back to his home country because he doesn't want to face the questioning of a bankruptcy trustee, I don't know that that's what is meant by 'habitual residence.' I don't think so.

Transcript pp. 64–65.

As previously noted, under Israeli law, an individual's motive for moving to Israel in order to escape U.S. justice is relevant to an Israeli court's determination of whether the individual's move to Israel represents a genuine attempt to establish his center of life in Israel or whether his flight from justice indicates that his stay in Israel is a temporary one, "until the storm blows over and not later." Abraham Abramovsky and Jonathan I. Edelstein, *The Post–Sheinbein Israeli Extradition Law: Has it Solved the Extradition Problems Between Israel and the United States or Has it Merely Shifted the Battleground?*, 35 Vand. J. Transnat'l L. 1, January, 2002 (citing *Attorney General v. Harosh*, Cr. C. (B.S.) 2484/99).

In November 2006, Ran sought permission from the Israeli court to defend himself from the United States by submitting to a video cross-examination. In his application to conduct cross-examination by video conference, Ran explains that he has transferred the center of his life to the United States and seeks permission to defend himself from the United States because should he re-enter Israel, the bankruptcy order would result in his indefinite detention in Israel which would work a hardship upon his wife and children in the United States. The application for cross-examination by video conference states:

11. If the applicant comes to Israel to be examined on his affidavit, he will thereafter be unable, in view of the stay of departure order pending against him, to return to his home, family, and work in the United States.

12. This risk does not only exist in view of the stay of departure order that was granted in the bankruptcy proceedings, but also in view of the probability that others (who in one way or another were involved with Credit Lines) will also be interested in staying his departure from Israel with applications of their own in order to exert pressure on him.

13. The immediate significance of his coming to Israel is the absolute collapse of the family, the income and the security—and the applicant cannot take such a risk.

Lavie Ex.5.

Judge Ronen denied Ran's requested for cross-examination by video conference. The order states:

... according to applicant if he comes to Israel to be cross-examined on his affidavit there is a fear that his departure from Israel will be stayed as a result of a pending stay of departure order against him in the framework of a bankruptcy order. The applicant is arguing that he left Israel about nine years ago and has since lived with his wife in five children in Houston, Texas. The center of the applicant life is therefore in the United States. The immediate significance of his coming to Israel is therefore the absolute collapse of his family, his income and his safety, which he cannot risk.....as aforesaid, if the order staying the applicants departure from Israel is indeed justified, there is also justification for the possible prejudice to the applicant arising as a result of this order and as a result of which the applicant must come to a decision—whether to come to Israel for the purpose of being cross-examined on his affidavit (in which case the stay of departure order will indeed enter into force and he will not be allowed to leave the country—so long as he does not regulate the matters by reason of which the order was issued) or to waive the filing of his affidavit, with everything implied therefrom. Accordingly the application is denied.

In addition to the reasons stated in the application, Ran testified that he is afraid

to go back to Israel. Transcript p. 48. Ran explained that prior to his departure in 1997, he and his wife received death threats, as well as threats to kidnap their children; that his car and his brother's office were firebombed; that his brother's car was destroyed in an acid attack; and that his parents had been harassed. Transcript p. 45. The veracity of Ran's testimony concerning his fear was carefully probed by Lavie's counsel on cross-examination.[8] In addition, Lavie testified that he was surprised by Ran's testimony on this point, as he did not recall any threats against Ran.[9] On cross-examination, however, Lavie remembered his investigators' report from 1997, which states:

> Yuval Ran had the use of a private 1994 Mercedes motorcar, registration 381600 ... according to information, the motorcar was reported as stolen in April or May 1997. Persons close to Yuval Ran have stated that the motorcar was stolen by a private creditor who burned it as a warning to Yuval Ran. Some of those close to him claim that it was probably

against this background that he made the decision to leave the country. Since 8/1997, Yuval Ran has not been registered as the owner of any vehicle.

Transcript pp. 53–56.

■ The motive of an individual in moving from one country to another may be relevant to a determination of the location of his center of main interests when a petition under Chapter 15 for recognition of a foreign proceeding is presented to the U.S. court on the heels of the individual's flight from the country in which the foreign proceeding is pending, but only to the extent that it might show the individual has not genuinely transferred his center of main interest to the U.S. and that his stay in the U.S. is only temporary. *See Shierson v. Vlieland–Boddy*, [2006] I.L.Pr. 12, [2005] EWCA Civ 974, (CA (Civ Div) 2005); *Jane Elizabeth Marinos v. Nikolaos Lykourgos Marinos*, [2007] EWHC 2047 (High Court of Justice Family Division 2007); *Alevizos v. Ikonomikon*, (Case C–392/05), [2007] 2 C.M.L.R. 51 (ECJ 4th Chamber, 2007) (Reference from Greece—

---

8. Q. Okay. Well, let's turn to that, exhibit 5 please.

> . . . .
> Q. I'm looking at the English version of it—paragraph 11.
> A. Uh-huh.
> Q. Just to refresh your recollection, what you told the court is that you were concerned if you come to Israel you would have to submit to the bankruptcy trustee.
> A. Mr. Miles I read the Hebrew. In the Hebrew it said in 11 that if I will come to Israel I will not be able to go out because court will not let me to go out.
> Q. Okay

Transcript pp. 49–50. Further:
> Q. Okay. Well, in any event, you don't say here that you're concerned about threats to your life in Israel today.
> A. (No verbal response)
> Q. You don't mention anything about threats in this motion.
> A. No, I didn't mention a lot of things in this motion.

> Q. Okay. And you don't mention anything about threats in your affidavit.
> A. No.

Transcript p. 50.

9. Lavie testified as follows:
> Q. Okay. Mr. Lavie, back in 1997 when Mr. Ran left the country, did Mr. Ran or his attorney ever say anything to you about these threats?
> A. No, I do not recall.
> Q. Until the testimony you heard just a few minutes ago, have you ever heard from Mr. Ran or anybody else anything about any of these alleged threats or car bombings whatever?
> A. The truth is that the testimony surprised me in this matter. I do not totally recall. I cannot claim that there was no such but this is definitely the first time I heard in today's testimony. To the best of my memory as of this moment, currently, I do not recall that in 1997 I heard about it.

Transcript pp. 52–53.

Simvoulio tis Epikratias (Council of State)); *Pedro Magdalena Fernandez v. Commission of the European Communities* (C–452/93) [1994] ECR 4295 (ECJ 3rd Chamber 1994); *Pinna v. Caisse d'Allocations Familiales de la Savoie,* (Case 41/84) [1986] E.C.R. 1(ECJ 1986); *Schaflein v. Commission of the European Communities,* (Case284/87) [1988] ECR 4475, (ECJ 2nd Chamber 1988).

■ The Court finds Ran to be a credible witness. The Court credits Ran's testimony that he left Israel because he was afraid for his safety and for that of his family. The Court finds that Ran's fears for his safety and his concern that he will be indefinitely detained in Israel under the bankruptcy order issued after his move to the United States are genuine. The Court finds that Ran's concern that returning to Israel will work a hardship on his family is legitimate. The Court finds that Ran is not a "fugitive" from Israeli justice and has not violated any Israeli bankruptcy court order. Ran's reasons for seeking to defend himself by video-conference from the United States do not support Lavie's contention that Ran remains in the United States to avoid the reach of the Israeli bankruptcy court's jurisdiction.

The Court credits Lavie's evidence that Ran transferred his center of life away from Israel. The Court credits Ran's evidence that he transferred the center of his main interests to the United States. The Court credits Ran's testimony that he intends to remain in the United States permanently. No facts show that Ran's move to the United States is temporary or that Ran intends to return to Israel once "the storm blows over." In addition to those facts previously found by the Court in its order of May 22, 2007, the Court finds that the following facts indicate Ran's relocation to the United States is permanent: (1) Ran owns a home in the United States in which he resides with his wife and their five children whose ages were 6, 8, 14, 15, and 17 at the time of trial; (2) Ran's wife and children are U.S. citizens; (3) Ran is a permanent resident of the United States whose application for U.S. citizenship was pending at the time of trial; (4) Ran's children attend school in Harris County, Texas; (5) Ran works in the United States; (6) Ran has not returned to Israel since he left in April 1997; (7) Ran maintains a bank account in Harris County, Texas, and does not maintain a bank account anywhere else; (8) Ran spends his free time going to baseball with his son and to soccer with his daughter; (9) Ran was an assistant coach with Bellaire Little League; and (10) Ran is a member of Beth Yeshurun Synagogue in Harris County, Texas. The Court finds that the United States, specifically Harris County, Texas, is the location of Ran's personal and occupational ties.

**J. Analysis of Foreign Representative's Motive Under *In re SPhinX, Ltd.,* 371 B.R. 10 (S.D.N.Y.2007)**

Lavie is neither the foreign representative of the bankruptcy estate of the Israeli corporations with which Ran was formerly associated, nor one of the corporate liquidators jointly appointed by the Israeli court currently managing the liquidation of those businesses. Lavie's admitted lack of activity since his appointment as trustee shows that he is not currently actively investigating, managing, collecting and liquidating Ran's former assets, in connection with which, he might be aided by recognition of his foreign proceeding under Chapter 15.

Lavie's lack of collection activity as bankruptcy trustee comports, however, with his stated goal in obtaining recognition of the Israeli bankruptcy proceeding. Lavie testified that he seeks recognition of

the Israeli bankruptcy pending against Ran because Ran has not agreed to repay the "tens of millions of Israeli shekels" in debts claimed by Bank Hapoalim Ltd., Pozeilov Pinchas, Pozeilov Ben Zion, American Israeli Bank, Ltd., Israel Discount Bank Ltd, United Mizrahi Bank of Israel Ltd, Bank Leumi Le–Israel Ltd, taxing authorities and the joint liquidators of ICL. Lavie testified that claims against Ran, apart from the lawsuit filed by the ICL joint liquidators, total NIS 60 million. In addition, the ICL liquidators seek NIS 560 million. Lavie testified:

> Q. And when a discharge is requested, is it common to work out some sort of arrangement with the Debtor?
>
> A. Yes, the way that is—it is traditionally done in Israel is that the process of discharging of the Debtor is done with his creditors, with arrangement with the creditors.
>
> Q. That's if—
>
> A. Why they do set what to his and they are reaching a settlement or arrangement.
>
> . . . .
>
> Q. Does it also request typically that the Debtor make some payments out of his earnings for a few years?
>
> A. Yes, absolutely. This is a possibility—possible way which happen quite often.
>
> Q. What are the typical ranges of—how many years' payments are generally approved?
>
> A. Assuming the Debtor tells the truth—claimed the truth of what he has, it is a process of four to five years. It takes four to five years to complete it.
>
> Q. And how does the Court and the Debtor determine how much will he pay?
>
> A. By the information—detailed information data that he is providing to the Court while he is obligated to provide everything and tell the entire truth.
>
> . . . .
>
> Q. Okay. Mr. Lavie, you have asked this Court to recognize you as foreign bankruptcy trustee. Could you explain to the Court why you want to be recognized, what you want to do with this case?
>
> A. The situation for my point is very simple. Yuval left Israel leaving behind him debts of tens of millions of Israeli shekels. Now, he is not taking care of anything. He is not trying to get any settlement or arrangement. He crossed the ocean. He is doing whatever he wants to do here.

Transcript pp.31–32. At an exchange rate of about 4 NIS to 1 U.S. dollar, Lavie's testimony shows that he seeks recognition in order to obtain Ran's agreement to repay from his future earnings the equivalent of roughly $15,000,000.00–$140,000,000.00 over 4–5 years.

The history of the development of Israeli bankruptcy law up to 1996 is described in Rafael Efrat, *The Evolution of the Fresh–Start Policy in Israeli Bankruptcy*, 32 Vand. J. Transnat'l L. 49 (1999). The Efrat article explains:

> Following the end of World War I, Britain gained military control over Palestine, parts of which are now Israel. In 1922, the League of Nations Council approved British control over that area pursuant to what is known as the British Mandate.
>
> . . . .
>
> The adopted British bankruptcy system served primarily as a creditors' collection mechanism ... while the debtor had the right to apply for an order of discharge, debt forgiveness was linked to payments that the debtor made or might make to creditors in the future.

. . . .

The bankruptcy process . . . generally involved several years of obligatory monthly payments by the bankrupt to the bankruptcy trustee. During this period, the undischarged debtor was restricted and limited in many aspects of his life and no attempt was made to address the financial and other related problems of the debtor. At the end of this prolonged bankruptcy period, debtors were not assured a debt forgiveness; in fact, very few discharges were granted to bankrupts. . . . The courts' assessment of whether the debtor was likely to get a discharge was generally based on the anticipated repayment level of the debtor's debts. That is, where courts found that the debtor was unlikely to repay at least fifty percent of his debts in bankruptcy, courts denied the debtor's application for bankruptcy protection on the ground that the debtor was unlikely to meet one of the statutory prerequisites for debt forgiveness.

. . . [M]ost courts tied such relief to adequate repayment of the debtor's debts . . . As a result, some bankrupts remained in that status without receiving a discharge for a period that sometimes extended up to fifteen or even twenty-five years. . . . [In 1996]the standard by which a court must decide whether to grant a bankrupt an unconditional discharge was significantly liberalized. . . . [W]hereas prior to the reform law a bankrupt would not be entitled to receive an unconditional discharge if he failed to pay the creditors at least fifty percent of his debts, that requirement has now been deleted. . . . [T]he length of time under which a bankrupt may be required to make monthly payments to his creditors as a condition of getting a discharge has been significantly altered. Whereas prior to the reform, a judge could have required the bankrupt to make monthly payments to his creditors for an indefinite period of time as a condition for getting a discharge, under the reformed law a judge can only limit such conditional discharge for a period not exceeding four years.

Rafael Efrat, *The Evolution of the Fresh–Start Policy in Israeli Bankruptcy*, 32 Vand. J. Transnat'l L. 49, 62–110 (1999).

In addition to these reforms, ". . . the legislators eased the out-of-court restructuring process . . . by reducing the minimum payments to be made under a proposed compromise from fifty to thirty percent of the unsecured debts." *Id.* at n. 305. Further, if the debtor does not qualify for bankruptcy relief, Israeli law provides the alternative of debtor's prison. *Id.* at 101–102 (Although "[t]he massive and routine utilization of debtor's prison as a collection vehicle irrespective of the debtor's financial condition . . . [has been] significantly curtailed and diminished in scope, it still remains an available and sometimes powerful collection tool.")

■■■ By citing favorably to *In re SPhinX*, 371 B.R. 10 (S.D.N.Y.2007) in its order of remand, the district court suggests that a foreign representative's bad faith motive in seeking recognition of a foreign proceeding may appropriately be considered in determining the location of a debtor's center of main interests. *Lavie v. Ran*, 384 B.R. 469, 471 (S.D.Tex.2008). Conducting a fact finding inquiry into the foreign representative's motives in seeking recognition of a foreign proceeding would, however, shift the Court's focus away from identifying the location of a debtor's center of main interests "by reference to criteria that are both objective and ascertainable by third parties." *See Eurofood IFSC Ltd.* (C–341/04), [2006] ECR 3813, (ECJ 2006). In *F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566 (5th Cir.2008), the Fifth Circuit stated the following concerning the FDIC's intent in pursuing litigation:

Doubtless many plaintiffs have multiple purposes in pursuing litigation. And so long as the merits of their claim, viewed objectively, are supported by a good-faith belief that the allegations are well founded and not frivolous, the subjective motivation for pursuing the claim and the multiple purposes are ordinarily of no moment.[FN79] As the Supreme Court held in *Hartman v. Moore*, "It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." [FN80]

---

FN79. We recognize the difficulty in identifying an "improper purpose" objectively, as an "improper purpose" connotes intent. However, we have consistently emphasized that we must follow an objective inquiry. See, e.g., *Whitehead*, 332 F.3d at 802; *Nat'l Ass'n of Gov't Employees, Inc.*, 844 F.2d at 224.

FN80. 547 U.S. 250, 260, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006).

*F.D.I.C. v. Maxxam, Inc.*, 523 F.3d 566, 581 (5th Cir.2008).

In light of the foregoing, and as the parties have not raised the issue of the foreign representative's motive in seeking recognition of the foreign proceeding as a factor to be considered in determining the debtor's center of main interests, the Court declines to make findings on remand of whether Lavie has acted in bad faith.

## K. Lavie Asserts that Ran Operates ICL by "Remote Control" and that this is a Factor Determining Ran's Center of Main Interests

Ran filed an affidavit in the Israeli litigation that states:

27. The only remaining activity in the financing sphere was the collection of old loans. This activity is limited (more or less relies on the appointment of external lawyers for the purpose of handling the collection which was never stopped and the deponent on behalf of the plaintiff, Barak Harari, even admits this in paragraph 52 of his affidavit) and is not at all similar in its scope to the active management of an active credit set—up as intended by the company and the managers at the time of contracting.

. . . .

29. Even in relation to the little that remained (the collection of the old loans), I never stopped providing the company with my services. I engaged therein so long as I was in Israel (until March or April 1997) and even after my departure, until the receivership and liquidation proceedings began in 1998 I believe, and it was no longer possible to engage therein. The plaintiff confirms, in paragraph 49 of Barak Harari's affidavit on its behalf, that even after I left Israel I continued engaging in the company's affairs. In such capacity, I also attended to collection of the old loans as mentioned in paragraph 27 above.

Lavie Ex. 4.

Lavie asserts, in his report to the Israeli court concerning the status of Ran's bankruptcy, that Ran operated ICL by "remote control" after Ran left Israel. Lavie Ex. 1 ¶ 18. Lavie bases his conclusion on his reading of reports written by the joint liquidators of ICL and on the content of Ran's affidavit excerpted above.[10] Lavie's report states:

---

10. Lavie did not introduce the reports of the joint liquidators into the record of this pro-

ceeding.

18. In that regard, it should be noted that as emerges from the liquidator's reports, even after fleeing abroad, the debtor continued managing Credit Lines by "remote control" from his place of refuge abroad, through local officers in Israel and various advisors, such as: Ms. Dina Claude, who in fact functioned as manageress in the Credit Lines companies and the various officers acted on her instructions, and through Mr. Eyal Gibor, who was elected as a co-CEO and acted in accordance with instructions he received from the debtor and other officers. In addition, as also emerges from the liquidator's reports, whilst abroad the debtor continued to participate in meetings of Credit Lines' board of directors and to take part in the company's decision-making process via telephone.

19. Mention should also be made of paragraph 29 of the affidavit filed by the debtor with the Tel Aviv district court on 20th November 2006, in the framework of the liquidator's claim (cf 2601/01), in which the debtor expressly stated as follows: 29. Even in relation to the little that remained (the collection of the old loans), I never stopped providing the company with my services. I engaged therein so long as I was in Israel (until March or April 1997) and even after my departure, until the receivership and liquidation proceeding began in 1998, I think, and it was no longer possible to engage therein. The plaintiff confirms, in paragraph 49 of Barak Harari's affidavit on its behalf, that even after I left Israel I continued engaging in the company's affairs. In such capacity, I also engaged in matters concerning the collection of the old loans as mentioned in paragraph 27 above.

Lavie Ex. 1.

Lavie did not prepare the reports referred to in paragraph 18. Lavie testified that all he knows of the operation of Ran's former businesses in Israel "is what is written in the liquidator report because you have to remember that I'm not dealing with the companies." Transcript p.28. Lavie failed to introduce any credible evidence supporting his conjecture that Ran operated Israeli companies after he relocated to the United States.[11]

Conversely, Ran testified that he did not manage the affairs of any company in Israel after he left. Transcript p. 45. Ran testified that the only activity in which he was involved after he left Israel was at the request of ICL's Israeli management who telephoned him for help in collecting bad debts of ICL customers. Transcript pp. 45–46. Ran testified that when ICL's Israeli management called him, he tried to help them as much as he could even though he did not have anything with him when he came from Israel. Transcript p. 46. Ran testified that he helped ICL's Israeli management in every task that they asked until the company was sold to a third party at the end of 1997. Transcript p. 46. Ran testified that the buyer ran the company for a year. Transcript p. 46. Ran testified that he left the company in the end of 1997, when the company asked him to resign. Transcript p. 46.

The Court finds Ran's testimony is credible. The Court finds Lavie failed to prove that Ran manages any companies located in Israel since he relocated to the United States.

---

11. Despite the lack of any supporting facts for Lavie's speculation, Lavie's counsel represented to the Court, "But we don't know exactly what he did, but he was continuing to work for the company." Transcript p. 67.

## V. Conclusion

■ At the conclusion of his presentation, Lavie's counsel argued, "The intent of the law is: there has to be some connection with the country in which the bankruptcy sits in order for this country's bankruptcy courts to be required to recognize it." Transcript p. 62. Lavie's counsel's argument reveals Lavie's fundamental misunderstanding of the statutory requirements for recognition under Chapter 15. For the Israeli bankruptcy to be entitled to recognition as pending in the location of Ran's center of main interests, the facts must show, at the time recognition is sought, not simply "some connection" between Ran and Israel, but that Ran's center of main interests is located in Israel. 11 U.S.C. § 1517(b)(1).

■ Lavie's proof proffered to establish that Ran's center of main interests lies in Israel consists of the fact that Ran was born in Israel and lived and worked there until 1997; that Ran has been sued in Israel, hired counsel to defend the lawsuit, and submitted an affidavit to the Israeli court; and, that Ran's debts to creditors incurred before his departure from Israel in 1997 remain unpaid.

These factors are outweighed by Lavie's other testimony and exhibits establishing that Ran transferred the center of his life away from the State of Israel in 1997, leaving all of his assets and business interests in Israel with the intention to never return. Lavie proved that Ran does not live in Israel, and that all of Ran's former Israeli business interests remain in Israel under the control of Israeli joint liquidators. The Court finds that Lavie failed to prove that Ran manages any business in Israel by "remote control" or otherwise.[12]

The Court finds Lavie's evidence supports both his representation to the Israeli bankruptcy court and to this Court that Ran's departure from Israel in 1997 was intended by Ran to be and has been so genuine and permanent as to constitute both an act of bankruptcy under Israeli bankruptcy law and a permanent transfer of the center of Ran's life from the State of Israel to the U.S.

## VI. The Presumption

■ To expedite issuance of an order granting or denying recognition of a foreign proceeding, Chapter 15 allows the Court the discretion to presume that in the absence of evidence to the contrary, an individual debtor's habitual residence is his center of main interests. 11 U.S.C. § 1516. This presumption is rebutted if the record contains evidence that some other location is the center of main interests of an individual debtor.

Rebuttal of the presumption contained in § 1516 is governed by Fed.R.Evid. 301, which provides:

> Presumptions in General in Civil Actions and Proceedings. In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.

Fed.R.Evid. 301.

■ The Fifth Circuit has adopted a "bursting bubble" theory of presump-

---

**12.** Lavie testified that he has no personal knowledge about the business activities of the corporations in which Ran was involved in Israel that are currently under the control of Israeli liquidators. Lavie testified that he does not know what business activity Ran has done since departing Israel in 1997.

tions under which the only effect of a presumption is to shift the burden of producing evidence with regard to the presumed fact. *Pennzoil Co. v. F.E.R.C.*, 789 F.2d 1128, 1136 (5th Cir.1986). If the party against whom the presumption operates produces evidence challenging the presumed fact, the presumption simply disappears from the case. *Id.* at 1137. Once the side against whom the presumption operates meets its burden of production the presumption completely disappears leaving the factual issue to be resolved at trial. *Id.* Rebuttal evidence dispels the presumption, but the underlying evidence remains in the case. *Id.* A fact finder could still credit the evidence of the party in favor of whom the rebutted presumption operates despite the existence of contrary evidence and despite the resultant destruction of the presumption. *Id.*

The court in *In re Tri–Continental Exchange Ltd.*, 349 B.R. 627 (Bankr.E.D.Cal. 2006) considered the effect of § 1516's presumption that the debtor's registered office is the center of main interests:

> In effect, the registered office (or place of incorporation) is evidence that is probative of, and that may in the absence of other evidence be accepted as a proxy for, "center of main interests." The registered office, however, does not otherwise have special evidentiary value and does not shift the risk of nonpersuasion, i.e. the burden of proof, away from the foreign representative seeking recognition as a main proceeding.
>
> Thus, if the foreign proceeding is not in the country of the registered office, then the foreign representative has the burden of proof on the question of "center of main interests." Correlatively, if the foreign proceeding is in the country of the registered office, and if there is evidence that the center of main interests

might be elsewhere, then the foreign representative must prove that the center of main interests is in the same country as the registered office.

> It follows that the burden of proof as to the "center of main interests" is never on the party opposing "main" status and that such an opponent has only a burden of going forward to adduce some evidence inconsistent with the registered office warranting a conclusion of "main" status.

*In re Tri–Continental Exchange Ltd.*, 349 B.R. 627, 635 (Bankr.E.D.Cal.2006).

■ Lavie had the burden of proving that Ran's center of main interests is in Israel, the location of the foreign proceeding for which Lavie seeks recognition. To the extent that Lavie had the burden of going forward with evidence to overcome the presumption that Ran's habitual residence in the U.S. is his center of main interests, Lavie met that burden and survived a motion for judgment at the close of Lavie's case in chief. To the extent that Ran might be understood to have the burden of going forward with evidence to show that he had changed his center of main interests from Israel, where he lived until 1997, to the U.S., where he has lived and maintained his personal and occupational ties since 1997, Ran met that burden.

Lavie's evidence, while sufficient to rebut the presumption was insufficient to prove by a preponderance of the evidence that Israel is the location of Ran's center of main interests. Lavie has not proved that Ran maintains any center of interests in Israel. The preponderance of the evidence shows that the location of Ran's center of main interests is the United States. Therefore, the facts show that Ran's center of main interests is located in the United States, which is the same location as Ran's habitual residence. Having

failed to carry his burden of proof as the foreign representative, Lavie is not entitled to recognition of the Israeli bankruptcy, and so the Court denied his petition for recognition.